JOHN H. FAULK, Respondent, v. AWARE, INC., et al., Appellants, et al., Defendants.

First Department, November 21, 1963.

*Charles E. Henry* of counsel (*Edward Cherney* and *Alexander C. Dick* with him on the brief; *Meleney, Dick & Engel,* attorneys), for appellants.

*Louis Nizer* of counsel (*Paul Martinson* and *George Berger* with him on the brief; *Phillips, Nizer, Benjamin, Krim & Ballon,* attorneys), for respondent.

RABIN, J. This action is in libel. At the time of the alleged libel the plaintiff was a radio and television performer. He had his own show known as the " John Henry Faulk Show ", a daily feature of Station WCBS. In addition he made guest appearances on other radio and television programs. There is no question but that he was widely known by the public and in his profession.

The defendant, Aware, Inc., is a "membership corporation whose purpose is to combat Communism in the entertainment and communication industries ".[1] The defendant, Hartnett, was a founder and director of Aware and his "principal source of income" was derived from "serving as a consultant to various sponsors and other institutions connected with the broadcasting industry, with respect to political backgrounds of radio and television performers."[1] The third defendant, Johnson, died during the course of the trial and his estate did not appeal from the judgment.

The plaintiff charges that the defendants conspired to defame him through the issuance of libelous articles with the express malicious intent of destroying his career in television and radio and that through the issuance of such libelous articles they succeeded in so doing. Chief among these articles was a special bulletin issued and published by the defendant, Aware, and written by the defendant, Hartnett. This bulletin was known as News Supplement to Membership Bulletin 16. It is charged by the plaintiff that it was distributed not only to the membership of Aware, Inc., but to its entire mailing list of about 2,000 names. The mailing was designed to and did reach every source or possible source of plaintiff's employment — radio and television stations, advertising agencies, sponsors of programs and advertisers, newspapers and columinists, and particularly the station employing the plaintiff and the sponsors supporting his program.

Plaintiff charged that this course of conduct was embarked upon by the defendants to remove him as on officer of the American Federation of Television and Radio Artists in retaliation for his campaign against the defendants' activities in the entertainment field. This campaign, according to the plaintiff, was directed against "certain nefarious and racketeering practices of the defendants, involving the use of intimidation and terror in order to procure the blacklisting of radio and television artists by the networks, sponsors, producers and advertising agencies and * * * the extortion of monies in consideration for the 'clearance' and * * * 'screening' radio and television artists charged * * * with subversive * * * associations."[2]

The plaintiff was extremely successful in his suit, the jury bringing in a verdict of $1,000,000 as compensatory damages as against all three defendants, and $1,250,000 as punitive damages against each of the defendants Aware and Hartnett.

---

1. Defendants' brief.
2. Paragraph Fifth, amended complaint.

The appellants claim, first, that the plaintiff failed to prove the publications complained of were libelous and urge, therefore, that the complaint should have been dismissed. The sufficiency of the complaint was tested in Special Term. Special Term held that the Aware bulletin " may reasonably be understood as charging that ' plaintiff was either a communist or that he co-operated in communistic activities and associated with communist figures ' (*Mencher* v. *Chesley, supra* [297 N. Y.] p. 99) * * * In the court's opinion, the contents of the article, assuming they are untrue, as alleged in the complaint, defame and libel plaintiff." (3 Misc 2d 833, 836.)

We unanimously affirmed (3 A D 2d 703). It is implicit in these decisions that the documents alleged to have been libelous may be held to be libelous and that if the plaintiff proves what is alleged in the complaint he makes out a *prima facie* case — not to be dismissed.

There was no denial that Aware issued and published the offending document, or that Hartnett was the author of that paper. The defendant interposed affirmative defenses — complete and partial. The complete defenses were truth and fair comment; the partial defenses were truth, reply and reasonable reliance.

With the exception of the partial defense of reasonable reliance, which was submitted to the jury, all of the defenses were dismissed at the close of the case for failure of proof. It is to be noted that the " defendants concede that, with one exception, that of partial truth, the Court correctly dismissed these defenses."[3] This is a telling admission.

The proof in support of the plaintiff's case was overwhelming. He conclusively established that the defendants planned to destroy his professional career through the use of the libelous publications directed to the places where they would do him the most harm. He proved that they succeeded in doing so. The proof established that the libelous statements were not made recklessly but rather that they were made deliberately. The acts of the defendants were proven to be as malicious as they were vicious. The defendants were not content merely with publishing the libelous statements complained of knowing that injury to the plaintiff must follow such publication. They pursued the plaintiff with the libel making sure that its poison would be injected directly into the wellsprings of his professional and economic existence. They did so with deadly effect. He was professionally destroyed, his engagements were cancelled and

---

3. Appellant's brief.

he could not gain employment in his field despite every effort on his part.

And what of the defenses? There was absolutely no support for them — to a point where the defendants admit that, except for the partial defense of truth and the partial defense of reasonable reliance, the court properly dismissed them. The partial defense of reasonable reliance was properly rejected by the jury, and the court, we believe, acted rightly in dismissing the partial defense of truth. There was nothing to support it nor did the evidence offered by the defendants rise to the level of " tending but failing to prove the truth " (*Crane* v. *New York Tel. Corp.*, 308 N. Y. 470, 476). So we have, as found by the jury and amply supported by the evidence, a vicious libel, deliberately and maliciously planned and executed with devasting effect upon the plaintiff, all without a semblance of justification.

The appellants urge further that the judgment be reversed because, among other reasons, " the testimony regarding ' blacklisting ' was so prejudicial as to amount to reversible error." Blacklisting, as its name implies, was the practice prevalent in the entertainment industry of listing those entertainers who were accused of being Communists, or of having communistic affiliations. Such listing invariably resulted in the cancellation of the engagements of one so listed and generally rendered him unemployable. That the defendants used the libelous material to effect the blacklisting of plaintiff was made quite clear.

The plaintiff charged that his blacklisting flowed from the publication of the libelous articles, and that because of it he lost his employment and became unemployable. That charge, though now conceded, was denied by the defendants in their answer. It accordingly became necessary for the plaintiff to prove it to establish his damage.

Nor is that the only reason for justifying the admission of testimony descriptive of blacklisting. Among the reasons given by the trial court for its admission was that " [p]laintiff is entitled to present such proof in connection with his claim for punitive damages against defendants as indicating their recklessness and wanton indifference to the rights of others, which in law is the equivalent of actual malice."

Strange as it may seem the appellants take the position that the blacklisting testimony should not have been received because, as they say, there " was no serious dispute at any time in this action that the appellants indulged in these practices, whether called ' blacklisting ', ' screening ', ' clearing ', or any similar word, and that this was a general practice in the broadcasting

industry."[4]  Of course, we assume that the defendants do not mean to convey the impression that it was the general practice to blacklist through the use of libel.  But that bare admission does not adequately inform the jury as to the nature of the blacklisting practice in the industry, or what effect it had on the ability of the plaintiff to obtain employment after he had been blacklisted as a result of the libelous statements.

Illustrative of that practice there was received testimony of several witnesses who had been blacklisted.  The appellants say that such evidence should not have been admitted.  The plaintiff's response is that such testimony was admissible in support of the plaintiff's claim for punitive damages.  Plaintiff points to the case of *Walker* v. *Sheldon* (10 N Y 2d 401, 404) where the Court of Appeals said: " It was the conclusion of the Appellate Division that, if the plaintiff is able to prove (what in effect she alleges) that the defendants were engaged in carrying on ' a virtually larcenous scheme to trap generally the unwary ', a jury would be justified in granting punitive damages.  We agree with that view."

The *Walker* case might be distinguished in that it was an action in fraud.  However, in view of the fact that one of the purposes for offering this testimony was to prove punitive damages, it might come within the four corners of the doctrine laid down in the *Walker* case or a logical extension thereof.  Be that as it may, the evidence was certainly properly received for two other reasons.  First, to lay a foundation for the proof of malice.  The plaintiff did allowably plead that the purpose of the defendants in defaming the plaintiff was to eliminate his opposition " to certain nefarious and racketeering practices of the defendants, involving the use of intimidation and terror in order to procure the blacklisting of radio and television artists by the networks, sponsors, producers and advertising agencies " and " the extortion of monies in consideration for the ' clearance ' and  *  *  *  ' screening ' radio and television artists charged  *  *  *  with subversive  *  *  *  associations."  Proof that the defendants blacklisted others was offered in support of that allegation which was pleaded to establish malice.  The second reason for permitting such proof was to give the jury a proper understanding of blacklisting, how it operated and how it affected the plaintiff.

Nor was this evidence received without qualification.  The Trial Justice clearly instructed the jury that it was received

---

4. Defendants' brief.

for a limited purpose, saying that they should be "concerned as to the true facts or merits of any charges only with this case of John Henry Faulk * * * What the merits might have been as to the other performers mentioned or testified to during the course of this trial is not a matter for your decision and does not affect one way or the other the truth or falsity of the charge made against Faulk."

Perhaps there is some merit to the defendants' claim that too much of such evidence was received. However, at what point a trial court should limit the evidence as being cumulative is ordinarily left to the discretion of the court. (6 Wigmore, Evidence [3d ed.], § 1908.)

There might also be some merit to the defendants' claim that some of the testimony relative to blacklisting was hearsay. Even if it were, such fact would not require a reversal unless it be determined that the "hearsay" testimony was of "such form and quantity as to violate the rights of defendant." (*Macy* v. *New York World Tel. Corp.*, 2 N Y 2d 416, 421.) It should be noted that in this case, as distinguished from the situation in the *Macy* case, the effects of the libel upon the plaintiff were testified to by the persons who refused to employ him and reliance was not placed solely upon the testimony of the plaintiff.

However, even assuming that some of the testimony was hearsay and some of it excessively cumulative, a reversal is not here called for. The guilt of the defendants was so clearly established by the other evidence in the case so as to have left the jury no choice but to find the defendants liable.

We are greatly concerned, however, with the size of the verdict — both as to compensatory and punitive damages. True, fixing the amount of damage is primarily in the province of the jury and as has been said with respect to libel cases, "the jury is generally considered to be the supreme arbiter on the question of damages" (*Lynch* v. *New York Times Co.*, 171 App. Div. 399, 401). The court, if possible, should try to avoid invading that field. However, a court may not stand by idly when it is apparent that a verdict is shockingly excessive. A jury's verdict must have some relation to reality and it is the court's duty to keep it so. We find the verdict to be grossly excessive and most unrealistic — even in the field of entertainment.

The plaintiff's prior earnings are an important factor in assessing the damage suffered when his earnings are cut off. His damage need not be limited to the level of his actual earnings at the time of the libel. His potential earnings may be taken into consideration when there is evidence to enable a jury to assess those potentialities (*Grayson* v. *Irvmar Realty Corp.*,

7 A D 2d 436). In this case, the plaintiff's potential earnings were fixed by his witnesses in amounts ranging from $100,000 to $1,000,000 a year. The larger figure was arrived at by reference to the earnings of those who had reached the very top of the profession. We are mindful of the statement of our colleague, Mr. Justice BREITEL, in the *Grayson* case where he said: '' in the case of persons of rare and special talents many are called but few are chosen.'' While the plaintiff's experts testified that the plaintiff would, without doubt, be among the '' chosen '', it seems that none of these experts, although in the entertainment field, was perceptive enough to contract for his services even though his earnings were never more than about $35,000 a year.

Those who testified to potential earnings of between $100,000 and $250,000 arrived at that estimate based upon what comparable performers were receiving. Yet they gave no explanation as to why the plaintiff's earnings were so comparatively low. In short, the testimony of the experts left plenty of room for speculation.

Upon that testimony, the jury was justified in its obvious conclusion that the plaintiff's prospects for advancement in his profession were extremely good and that his income would rise correspondingly. Despite that however, there is hardly enough justification for the finding of compensatory damages in the amount of $1,000,000, even making allowance for his mental pain and suffering. It is interesting to note that at current savings bank interest rates, his yearly income for life would exceed the best of his past earnings. We believe that the compensatory damages should be fixed at a figure no higher than $400,000.[5]

We now consider the amount of punitive damages awarded. What is the nature of punitive damages and for what purpose do we allow their imposition? '' [W]here the wrong complained of is morally culpable, or is actuated by evil or reprehensible motives,'' punitive damages are allowable '' not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future.'' In addition, the sanctioning of such damages '' ' leads to the actual prosecution of the claim for punitive damages, where the same motive would often lead him to refrain from the trouble incident to appearing against the wrongdoer in criminal proceedings.' (McCormick, Damages [1935], pp. 276–277.) '' (*Walker* v. *Sheldon,* 10 N Y 2d 401, 404.)

5. From that figure should be deducted the sum of $175,000, if that be the figure received from the Johnson estate in settlement of plaintiff's claim as against it (*Livant* v. *Livant,* 18 A D 2d 383).

While there "is no rigid formula by which the amount of punitive damages is fixed" (*I. H. P. Corp.* v. *210 Cent. Park South Corp.,* 16 A D 2d 461, 467 affd. 12 N Y 2d 329) there are limits beyond which a jury should not be permitted to go. It is the duty of the court to keep a verdict for punitive damages within reasonable bounds considering the purpose to be achieved as well as the *mala fides* of the defendant in the particular case. In observance of such duty we conclude that the awards made for punitive damages in this case are grossly excessive.

The jury awarded the sum of $1,250,000 against each of the two appellants. However, one was more culpable than the other. They should not be punished alike. While Aware was a willing participant in the publication of the libel, Hartnett was the chief actor. It was Hartnett, rather than Aware, who stood to gain or lose depending upon whether the plaintiff was to be permitted to resist his activities or be silenced. It was he who was the author of the objectionable pamphlet and it was he who put it in places where it would hurt the plaintiff the most. The assessment of punitive damages against him should be in a much greater amount than against Aware.

It is our considered opinion that the maximum sum that should have been awarded against Aware, by way of punitive damages, is $50,000, and as against Hartnett, who by far was the more guilty of the two, the sum of $100,000.

We are not impressed by the argument of the appellants that they were prejudiced by the continuance of the case against Johnson, through the appointment of a temporary administrator after his death. Without passing upon the propriety of such action, we fail to see how these appellants were prejudiced thereby. The suggestion that the punitive damages assessed against appellants were increased because the jury was charged that it might not assess such damages against the Johnson estate is entirely speculative. Even if there were any basis for such conclusion its effect would be overcome by our present decision.

Accordingly, the judgment should be reversed, on the law, on the facts and in the exercise of discretion, without costs, and a new trial ordered unless the plaintiff consents to a reduction of the amount of compensatory damages to $400,000 and punitive damages as against Aware to the sum of $50,000 and as against Hartnett to the sum of $100,000, in which event the judgment as modified, should be affirmed, without costs.

BREITEL, J. P., McNALLY, EAGER and BERGAN, JJ., concur.

Judgment unanimously reversed, on the law, on the facts and in the exercise of discretion, without costs, and a new trial

ordered unless the plaintiff consents to a reduction of the amount of compensatory damages to $400,000 and punitive damages as against Aware to the sum of $50,000 and as against Hartnett to the sum of $100,000 in which event the judgment as modified, is affirmed, without costs. Settle order on notice.