**Lisa JORGENSEN, et al.,**
**Plaintiffs, Appellees,**

v.

**MASSACHUSETTS PORT AUTHORITY,**
**Defendant, Appellee.**

**Appeal of Donald HERTZFELDT and**
**Peter Langley, Plaintiffs.**

**No. 89–1985.**

United States Court of Appeals,
First Circuit.

Heard March 6, 1990.

Decided June 6, 1990.

As Amended June 11, 1990.

516

Walter H. Walker, III, for appellants.

Michael J. Holland, with whom George N. Tompkins, Jr., Deborah A. Elsasser, and Condon & Forsyth, New York City, were on brief, for appellee Massachusetts Port Authority.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

This is an appeal from an order of the district court setting aside a jury's award of damages to appellants Donald Hertzfeldt and Peter Langley for harm allegedly done to their reputations as airline pilots as a result of their involvement in an aircraft accident that was found to have been caused, in part, by the negligence of the defendant-appellee Massachusetts Port Authority. The district court ruled, as a matter of Massachusetts law, that losses for harm to reputation were not recoverable elements in an "ordinary" negligence case. The court alternatively held that even if reputation losses were recoverable in an ordinary negligence case, there was insufficient evidence in the record to support the jury's damage awards. For the reasons discussed below, we affirm.

## I. BACKGROUND

Donald Hertzfeldt and Peter Langley were the first officer and captain, respectively, of a World Airways DC–10 jet that skidded off the end of an icy Logan Airport runway on January 23, 1982 and plunged partially into Boston Harbor, killing two persons and injuring many others. Numerous lawsuits arose out of the accident. The particular suit at issue in this appeal was filed by Hertzfeldt and Langley against the Massachusetts Port Authority ("Massport"), the operators of Logan Airport, seeking damages for personal injuries and property damage allegedly sustained as a result of Massport's negligent failure to keep the runway adequately cleared of ice.

By agreement of the parties, the district court divided the trial into two phases—liability and damages. In the liability phase, the jury returned a verdict for the plaintiffs, finding that Massport had been negligent in its maintenance of Logan Airport on January 23, 1982, and that this negligence was a proximate cause of the accident. In the damages phase, a second jury subsequently awarded $1,021,840 to Langley and $444,700 to Hertzfeldt as compensation for the damages each had suffered.[1]

These damage awards were subdivided by the jury into discrete components on a special verdict form. The verdict form specified the following elements of damages:

1) loss of personal property;

2) loss of wages for a five month investigatory period following the accident during which Hertzfeldt and Langley were prohibited from flying;

3) physical injury, pain and suffering, and related emotional distress resulting from the accident;

4) loss of past, present and future earning capacity; and

5) emotional distress because of harm to reputation and earning capacity.

Elements four and five, claimed by both Hertzfeldt and Langley, rested on a theory of harm to reputation. Hertzfeldt argued that his reputation as a safe pilot was harmed by the accident, despite the fact that Massport's negligence was found to be a proximate cause of the accident. As a result, Hertzfeldt claimed that when he was later furloughed following a personnel cutback by World Airways ("World"), he was unable to obtain another airline position commensurate with his ability and ex-

---

1. For the sake of brevity and clarity, we have condensed our discussion of the extended procedural history of this case. The liability phase of the trial actually consolidated approximately 40 cases stemming from the accident to determine the relative liability of World Airways, Massport and the United States to the various plaintiffs. The claims against the United States were made under the Federal Tort Claims Act and were tried to the court; the claims involving World Airways and Massport were tried to the jury. Because only the damage claims made by Hertzfeldt and Langley against Massport are at issue in this appeal, we have limited our discussion of the procedural background to these claims.

perience and was forced to accept an inferior, lower paying position with Pan American Airline's Shuttle ("Pan Am"). This, Hertzfeldt argued, damaged his earning capacity and resulted in emotional distress. Somewhat differently, Langley contended that the accident harmed his reputation at World Airways, leading to his ostracism by fellow workers. This, in turn, he claimed, caused him emotional distress and led to his resignation from World, and a corresponding loss of earning capacity when he was unable to find a job in a non-airline occupation.

The jury found in favor of both Hertzfeldt and Langley on all specified damage elements. Massport then moved for judgment notwithstanding the verdict as to all elements except the claims for loss of personal property. In response to Massport's motion, the trial court upheld the awards for lost wages and ordered a partial remittitur with respect to the awards for physical injuries and pain and suffering. In the ruling that resulted in this appeal, the court set aside the awards for lost earning capacity and emotional distress stemming from harm to reputation on the grounds that: (1) although reputation damages were available in actions sounding in defamation, they were not recoverable in an ordinary negligence case, such as this, involving claims arising from an accident that produced physical injuries; and (2) even if such damages were recoverable, plaintiffs had introduced insufficient evidence to support their claims.

Hertzfeldt and Langley accepted the remittitur. They appeal only that portion of the district court's order setting aside the damage awards premised on harm to reputation. We divide our consideration of the matter into the same two issues articulated by the trial court below: (1) does Massachusetts law permit recovery of reputation damages in an ordinary negligence case such as this, and (2) if it does, did plaintiffs introduce sufficient evidence to support the

jury's finding that such damages were suffered.

## II. REPUTATION DAMAGES IN AN ORDINARY NEGLIGENCE CASE

Plaintiffs have cited no Massachusetts cases [2] addressing the question of whether reputation damages are recoverable in an ordinary negligence case, and we have found none. In the absence of any Massachusetts authority, plaintiffs rely on three arguments to support their claim that reputation damages are recoverable in this context.

First, plaintiffs make a broad policy argument that the purpose of tort law is to compensate people for injuries that they have sustained as the result of others' conduct. To accomplish this purpose here, plaintiffs contend, requires recognition of a cause of action for harm to reputation. Second, plaintiffs rely on the Third Circuit's decision in *Quinones v. United States*, 492 F.2d 1269, 1273–79 (3d Cir. 1974), which recognized a general cause of action for negligent maintenance of employment records brought under the Federal Tort Claims Act ("FTCA") by an employee who claimed that the inadequate maintenance of employment records by his employer injured his reputation and rendered him unable to find a new job. *See also Bulkin v. Western Kraft East, Inc.*, 422 F.Supp. 437, 442–45 (E.D.Pa.1976). Plaintiffs contend that *Quinones* supports the validity of claims for reputation damages in a general negligence setting. Finally, plaintiffs rely on our recent decision in *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 892–94 (1st Cir.1988) (en banc), *cert. denied*, —— U.S. ——, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989), in which we held, as a matter of Massachusetts contract law, that a party could receive consequential damages if she proved "with sufficient evidence that a breach of contract proximately caused the loss of identifiable pro-

**2.** At oral argument, plaintiffs' counsel indicated that he had objected below to the trial court's decision to apply Massachusetts rather than California law. This objection also was noted in a footnote in plaintiffs' opening brief. Plaintiffs,

however, have not presented on appeal any substantive arguments in support of their contention, and we do not consider the issue as being before us.

fessional opportunities." *Id.* at 894. Plaintiffs interpret *Redgrave* as recognizing a cause of action for reputation damages in contract claims, and argue that similar reasoning is applicable to ordinary negligence claims.

Each of these arguments was considered and rejected by the district court below. First, with respect to plaintiffs' appeal to the general compensatory objectives of tort law, the court noted that limitations exist on the scope and extent of tort liability and it has never been accepted law that people are liable for all the results of their conduct, no matter how indirect or unforeseeable.

Second, the lower court minimized the significance of the *Quinones* decision by observing that the First Circuit explicitly refused to follow the reasoning of *Quinones* on closely analogous facts in *Jimenez–Nieves v. United States*, 682 F.2d 1, 6 (1st Cir.1982). The lower court appeared to draw from *Jimenez–Nieves* the proposition that actions in tort seeking loss of reputation damages typically sound in defamation, regardless of how labeled, and thus that Hertzfeldt and Langley must fail because they were attempting to recover for defamation without meeting the requirements of a defamation action.

Finally, the court distinguished *Redgrave* by noting that *Redgrave* involved a contract claim rather than a tort claim and did not uphold a general reputation-damage claim but only allowed recovery upon a specific showing of particular lost job opportunities. In light of the plaintiffs' failure to cite any cases from Massachusetts or any other jurisdiction upholding a reputation-damage claim made in an ordinary negligence setting, and in light of policy considerations limiting the scope of tort liability, the district court concluded that such a claim would not be cognizable under Massachusetts law.

Although we find the lower court's reasoning persuasive, we must state that after canvassing the law in Massachusetts and other jurisdictions, we are not as certain as the district court that Massachusetts necessarily would decline to recognize claims for reputation damages made in the general negligence context. We divide our discussion into two sections: (a) would Massachusetts find the tort of defamation to encompass or preempt all reputation-damage claims, and (b) if not, would Massachusetts recognize reputation-damage claims in a general negligence setting.

### A. *Defamation As Encompassing All Reputation–Damage Claims*

■ We have found no Massachusetts authority discussing the question of whether defamation necessarily encompasses or preempts all reputation-damage claims. The absence of Massachusetts precedent leaves *Jimenez–Nieves*, 682 F.2d 1, as the only authority discussing the issue in this jurisdiction. In *Jimenez–Nieves*, the plaintiff premised his tort claim on the Social Security Administration's conduct in erroneously stopping payment on certain benefit checks. As a result of this action by Social Security, the plaintiff was suspected by others of fraud and also suffered severe financial hardship. He sued Social Security under the FTCA, claiming, among other things, public humiliation, injury to his credit rating, and other reputation-related harm. We held that insofar as the plaintiff's claim alleged injury to reputation, it was barred under the FTCA because it sounded in defamation, despite plaintiff's characterization of it as a general tort action. We found the claim to resound in the "heartland" of defamation because: (1) the injury was to reputation, and (2) the challenged conduct involved the communication of an idea. We defined "communication" as bringing an idea to the perception of another, either explicitly or implicitly, and observed that the Social Security Administration's conduct in stopping payment on plaintiff's checks constituted communication because it had brought defamatory ideas about the plaintiff (presumably, that he had committed welfare fraud or was a poor credit risk) to the perception of others. *See Jimenez–Nieves*, 682 F.2d at 6. We specifically declined to follow the reasoning of the Third Circuit in *Quinones*, which had found a claim for the negligent maintenance of employment records to sound out-

side the realm of defamation, and thus to be cognizable under the FTCA. *See id.; see also Moessmer v. United States,* 579 F.Supp. 1030, 1031 (E.D.Mo.1984) (following *Jimenez–Nieves* rather than *Quinones* ), *aff'd,* 760 F.2d 236 (8th Cir.1985).

Although it is possible to construe *Jimenez–Nieves* as holding that *all* claims alleging injury to reputation sound in defamation, it is not clear that Massachusetts courts necessarily would construe it this broadly or even choose to apply it if it were so construed. As we read *Jimenez–Nieves,* it holds that where the injury is to reputation *and* the conduct is the communication of an idea, the claim sounds in defamation. *See Jimenez–Nieves,* 682 F.2d at 6. Thus, it is not simply the element of injury to reputation that makes conduct sound in defamation. There also must be a communication, defined as conduct that brings an idea to the perception of others.

Some courts have emphasized the injury to reputation element more heavily than the communication element in ruling that claims alleging harm to reputation sound in defamation rather than in ordinary negligence or any other tort. *See Ross v. Gallant, Farrow & Co.,* 27 Ariz.App. 89, 551 P.2d 79, 82 (1976); *Morrison v. Nat'l Broadcasting Co.,* 19 N.Y.2d 453, 280 N.Y. S.2d 641, 644, 227 N.E.2d 572, 574 (1967) (stating that defamation is defined in terms of the injury—damage to reputation). Although Massachusetts certainly could choose to follow this approach, even these courts have noted the existence of conduct on the defendant's part constituting communication. *See Ross,* 551 P.2d at 82; *Morrison,* 280 N.Y.S.2d at 644, 227 N.E.2d at 574. Arguably, no such communication existed here. Unlike in *Jimenez–Nieves,* the defendant's conduct here is not what conveyed to others the idea that caused harm to the plaintiffs' reputations. Massport's failure to clear the runway of ice did not bring to the minds of others the concept that Hertzfeldt and Langley were not capable pilots. Rather, Massport's conduct caused a result—the accident—which then could have caused others to question plaintiffs' skills as pilots. Because the defendant's conduct was one step removed from

the alleged injury to reputation, there arguably was no communication. And without a communication, plaintiffs' claims do not sound in defamation under the reasoning of *Jimenez–Nieves.*

One could attempt to turn this distinction of *Jimenez–Nieves* against the plaintiffs by arguing that in the absence of a communication, plaintiffs are impermissibly trying to recover for defamation without proving all the elements of defamation. This argument has some validity. We are not fully persuaded, however, that Massachusetts would stretch *Jimenez–Nieves* this far. *Jimenez–Nieves* states only that where there is an alleged injury to reputation *and* a communication, the plaintiff's claim sounds in defamation despite any attempt to characterize it otherwise. *Jimenez–Nieves* does not state that without a communication, and hence without defamation, there can be no cognizable action for reputation damages of any sort. To so hold would eliminate an important distinction between the tortious wrong alleged by a plaintiff and the items of damages flowing from the tortious wrong. *See Black v. Sheraton Corp. of America,* 564 F.2d 531, 540–41 (D.C.Cir.1977) (describing this distinction). Defamation is a type of tortious wrong. Injury to reputation is a particular item of damages. We are not convinced that Massachusetts would hold that damages for injury to reputation may only be recovered in a defamation action. *Cf. Kleeblatt v. Business News Publishing Co.,* 678 F.Supp. 698, 701–03 (N.D.Ill.1987) (dismissing a defamation claim on the ground that no communication had occurred, but upholding a negligence-based reputation claim). Accordingly, we find that neither *Jimenez–Nieves* nor any other authority provides a basis for concluding that Massachusetts necessarily would find defamation to encompass or preempt all claims alleging injury to reputation. We thus must address the question whether, assuming no preemption, Massachusetts would recognize the validity of a reputation-damage claim in a general negligence setting.

## B. Reputation–Damage Claims in a General Negligence Setting

Plaintiffs' emphasis on the compensatory objectives of tort law is not sufficient to persuade us that Massachusetts would recognize their reputation-damage claims. There are widely acknowledged limits on the scope of tort liability—limits that are motivated by policy considerations such as the need to prevent costly, meritless litigation, the desire to avoid disproportionality between liability and fault, and the goal of only allowing liability or damages when the prospect of injury was reasonably foreseeable to the defendant. *See, e.g., Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50, 54–56 (1st Cir.1985); *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171, 175–81 (1982).

Our research has disclosed two cases where courts invoked such policy considerations to reject ordinary negligence reputation-damage claims similar to those made by plaintiffs here. In *Greives v. Greenwood*, 550 N.E.2d 334 (Ind.Ct.App.1990), the court rejected a negligence claim alleging injury to reputation as a cattle raiser made by a plaintiff whose cattle were negligently inoculated with a fatal virus by the defendant veterinarian. The court stated:

> Damages for loss of reputation are only available in actions for libel, slander, abuse of process, malicious prosecution and third party contract interference. These intentional torts afford this remedy because the result is foreseeable. Foreseeability means that which it is objectively reasonable to expect, not merely what might conceivably occur.

*Id.* at 338 (citations omitted). Similarly, in *Hamilton v. Powell, Goldstein, Frazer & Murphy*, 167 Ga.App. 411, 306 S.E.2d 340 (1983), *aff'd*, 252 Ga. 149, 311 S.E.2d 818 (1984), the court rejected a negligence claim alleging malpractice and injury to reputation made by a plaintiff against a law firm for erroneous securities law advice that had resulted in the arrest of the plaintiff for securities fraud. Like *Greives*, the court in *Hamilton* stated that reputation damages were only available in "actions alleging intentional or wanton mis-

conduct." *Id.*, 306 S.E.2d at 344. Although the court did not say so explicitly, foreseeability concerns would appear to underlie this result.

There are, however, other cases that have allowed reputation damages in negligence settings. In *Oksenholt v. Lederle Laboratories*, 294 Or. 213, 656 P.2d 293 (1982), the court allowed a claim by a doctor against a drug manufacturer alleging economic harm (loss of earning capacity) resulting from injury to the doctor's reputation when he prescribed a drug as to which the manufacturer had failed to give complete and accurate warnings and the patient taking the drug subsequently became blind. The court stated that loss of earning capacity stemming from injury to reputation is a legally cognizable cause of action in negligence where the breach of an obligation owed by a defendant causes economic loss. *See id.* 656 P.2d at 296. Similarly, in *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 462 N.Y.S.2d 421, 448 N.E.2d 1332 (1983), the court allowed a pecuniary damages claim for lost business due to injury to reputation made by a dentist who accidentally caused the death of a patient when he administered nitrous oxide instead of oxygen from an anesthetic machine negligently repaired by the defendants.

These are the only cases that we have found, other than *Quinones* and its progeny, in which courts have recognized a claim for reputation damages in a general negligence setting. Assuming our research has been thorough, it therefore appears that the courts recognizing such a claim are few in number. Moreover, those courts recognizing reputation-damage claims have generally failed to address the foreseeability concerns that have been articulated by the courts rejecting such claims.

Massachusetts very well could invoke these foreseeability concerns as justification for not recognizing reputation-damage claims in the ordinary negligence setting. It is also conceivable that Massachusetts courts could choose to satisfy foreseeability concerns by applying an approach analogous to that taken by us in *Redgrave v. Boston Symphony Orchestra, Inc.*, 855

F.2d 888 (1st Cir.1988) (en banc), *cert. denied*, —— U.S. ——, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989). In *Redgrave*, we observed that Massachusetts usually did not recognize damages for injury to reputation in contract actions because such damages are remote, speculative, and not within the contemplation of the parties. *See id.* at 892–93; *see also Daley v. Town of West Brookfield*, 19 Mass.App. 1019, 476 N.E.2d 980, 980 n. 1 (1985). We held, however, that if a plaintiff could show specific lost job opportunities proximately resulting from the defendant's breach of contract, such a showing would distinguish the claim from more general reputation claims and would constitute a cognizable cause of action because such specific lost job opportunities could have been within the reasonable contemplation of the parties. *See Redgrave*, 855 F.2d at 893.

Although *Redgrave* was a contract case rather than a tort case, the concern about awarding damages not within the contemplation of the parties is analogous to the concern about foreseeability in the tort context. It seems conceivable to us, therefore, that Massachusetts might follow the approach of *Redgrave* and decide to respond to these foreseeability concerns not by rejecting reputation-damage claims entirely, but by allowing them if plaintiffs can show specific identifiable lost job opportunities or an equivalently particular form of injury.

We do not mean to express any opinion as to whether Massachusetts should follow a *Redgrave*-type approach. As the concurrence notes, this is an issue on which it is the responsibility of the Massachusetts courts, not the federal courts, to make the law. We simply indicate our view that uncertainty exists as to which approach Massachusetts might follow. Our decision, however, does not turn on this issue. As we discuss in the following section, regardless of whether the plaintiffs' allegations are legally cognizable, we must affirm the lower court's order due to the plaintiffs' failure to adduce sufficient evidence to support their reputation-damage claims.

## III. SUFFICIENCY OF THE EVIDENCE

■ In addition to ruling that plaintiffs' claims of injury to reputation failed to state a cognizable cause of action, the district court alternatively held that plaintiffs had failed to support their claims with sufficient evidence, even if the cause of action were valid. In reviewing a grant of judgment notwithstanding the verdict, we must view the evidence in the light most favorable to the plaintiffs. If fair-minded jurors could differ, then the judgment n.o.v. cannot stand. *See, e.g., Borras v. Sea–Land Service, Inc.*, 586 F.2d 881, 885 (1st Cir. 1978). However, "the party for whom the jury found is not entitled to 'unreasonable inferences which rest on conjecture and speculation.'" *Redgrave*, 855 F.2d at 896 (quoting *Carlson v. American Safety Equipment Corp.*, 528 F.2d 384, 386 (1st Cir.1976)).

■ In any negligence cause of action, there are four elements on which plaintiffs must adduce adequate evidence to prevail. Plaintiffs must show: (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury. *See* W. Prosser & W. Keeton, *The Law of Torts* § 30 (5th ed. 1985); *see also Quinones*, 492 F.2d at 1274. The existence of a duty and the breach of that duty are not at issue here: the parties are not appealing the initial jury's finding in the liability phase that Massport was negligent in maintaining Logan Airport on January 23, 1982. Proximate cause, however, is very much at issue. The district court overturned the jury's verdict on the ground that the evidence presented in the case "was insufficient to support a reasoned finding by the jury that the losses alleged by plaintiffs through harm to reputation were proximately caused by the negligence of Massport."

■ Under Massachusetts law, proximate cause requires a showing by the plaintiff, first, that the loss was a foreseeable consequence of the defendant's negligence, second, that the defendant's negligence was a but-for cause of the loss, and

third, that the defendant's negligence was a substantial factor in bringing about the loss. The last two elements relate to the concept of actual causation, or causation-in-fact. We will discuss the sufficiency of the evidence with respect to each of these elements in turn. For purposes of our foreseeability discussion, we treat Hertzfeldt and Langley together. For purposes of discussing actual causation, we treat the facts as to each plaintiff separately.

## A. *Foreseeability*

■ A defendant can be found liable for the violation of a duty owed to a plaintiff only when the risk of injury stemming from the defendant's conduct was foreseeable. *See, e.g., McGuiggan v. New England Tel. & Tel. Co.*, 398 Mass. 152, 496 N.E.2d 141, 142–43 (1986); *Wiska v. St. Stanislaus Social Club, Inc.*, 7 Mass.App. 813, 390 N.E.2d 1133, 1136 (1979) ("It is basic that a defendant cannot be held liable unless the injury was a foreseeable consequence of the negligent act."); *see also Marshall v. Nugent*, 222 F.2d 604, 610 (1st Cir.1955) (articulating the same principle under New Hampshire law). The plaintiff need not show that the *particular* harm that resulted was foreseeable to the defendant; however, the plaintiff must show that a harm of the same general character was a foreseeable result of the defendant's conduct. *See, e.g., In re Sponatski*, 220 Mass. 526, 530–31, 108 N.E. 466 (1915); *Glick v. Prince Italian Foods, Inc.*, 25 Mass.App. 901, 514 N.E.2d 100, 102 (1987). An alternative verbal formulation is that a defendant is liable "for the natural and probable consequences of his conduct." *Dziokonski v. Babineau*, 375 Mass. 555, 380 N.E.2d 1295, 1302 (1978). Although questions concerning what is or is not reasonably foreseeable are typically left to the jury, "there are instances when the judge may decide them as a matter of law, where no rational view of the evidence would warrant a finding of negligence." *Glick*, 514 N.E.2d at 102.

Applying these standards to the facts of this case, we seriously doubt whether plaintiffs adduced sufficient evidence to support a finding that injury to their reputations or any harm of the same general character was foreseeable by Massport as a potential consequence of failing to keep the runways at Logan Airport adequately cleared of ice. Our doubts about the viability of the evidence are strengthened by a review of Massachusetts cases in which courts have found a lack of foreseeability. In *Ted's Master Service, Inc. v. Farina Bros. Co.*, 343 Mass. 307, 178 N.E.2d 268 (1961), the court held that the defendant had no reason to anticipate that vibrations from the pile driver he was operating would cause damage in homes located 60–70 feet away. *See id.* 178 N.E.2d at 270. Similarly, in *Young v. Atlantic Richfield Co.*, 400 Mass. 837, 512 N.E.2d 272 (1987), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988), the court found the defendant gas station not liable, due to lack of foreseeability, for the death of a boy who was struck and killed by a negligently driven car after getting out to pump gas into his mother's automobile. The court assumed that the gas station was negligent in failing to post explicit signs informing customers that its attendants pumped all gas. The court held, however, that even assuming that the failure to have signs increased the likelihood that customers would get out to pump their own gas, "the risk that a customer who left his vehicle to pump gas would be injured by a negligently operated motor vehicle was not a reasonably foreseeable consequence of any negligent failure to post such a sign." *Id.* 512 N.E.2d at 275. The evidence introduced to support foreseeability in these cases seems at least as strong, if not stronger, than the evidence introduced by Hertzfeldt and Langley. Because there were findings of no foreseeability in the cited cases, it seems quite probable that lack of foreseeability would be an insurmountable obstacle here.

We recognize, nonetheless, that the issue of foreseeability is largely a policy decision, rather than a question to which objective legal principles can cleanly be applied. Thus, it is an issue better left to a state's own courts to resolve. For this reason, we choose not to decide the matter finally, but rather rest our affirmance of the district

court on the more narrow determination, discussed *infra*, that plaintiffs failed to adduce sufficient evidence of actual causation.

### B. *Actual Causation*

■ The plaintiff in a negligence action has the burden of establishing, by a preponderance of the evidence, the existence of a causal connection between the defendant's actions (or inactions) and the injury sustained by the plaintiff. *See, e.g., Comeau v. Beck*, 319 Mass. 17, 64 N.E.2d 436, 437 (1946); *see also Soares v. Lakeville Baseball Camp, Inc.*, 369 Mass. 974, 343 N.E.2d 840, 841 (1976). This connection cannot be left to the jury's conjecture or speculation. *See, e.g., Zezuski v. Jenny Mfg. Co.*, 363 Mass. 324, 293 N.E.2d 875, 878 (1973); *Landon v. First Nat'l Stores, Inc.*, 353 Mass. 756, 231 N.E.2d 575, 576 (1967). Phrased another way, it is not enough to show the mere *possibility* of a causal connection; the *probability* of such a connection must be shown. *See Berardi v. Menicks*, 340 Mass. 396, 164 N.E.2d 544, 546–47 (1960).

■ This requirement of showing a connection between the defendant's conduct and the plaintiff's alleged injury is also described as the requirement of showing actual causation, or causation-in-fact. Massachusetts courts have articulated at least two elements as constituting part of the actual causation inquiry. Plaintiffs must show that defendant's conduct was a but-for cause of their injury, *see Wallace v. Ludwig*, 292 Mass. 251, 254, 198 N.E. 159 (1935), and that defendant's conduct was a "substantial legal factor" in bringing about the alleged harm to the plaintiff. *See Tritsch v. Boston Edison, Co.*, 363 Mass. 179, 293 N.E.2d 264, 267 (1973).

The district court below ruled, as a matter of law, that neither Hertzfeldt nor Langley had adduced sufficient evidence to show the existence of a causal connection between Massport's negligent maintenance of the runway and the alleged injuries to plaintiffs' reputations. We agree.

### 1. Hertzfeldt

■ The crux of Hertzfeldt's theory of reputation damages is that as a result of the accident, his reputation as a safe pilot was substantially harmed. Consequently, when he was furloughed by World Airways in 1986 as a result of World's financial difficulties, he was unable to obtain another flying position commensurate with his skill and experience, and thus suffered damage to his earning capacity as well as emotional distress. The evidence offered by Hertzfeldt to support this claim consisted primarily of his own testimony, as well as the testimony of Captain Vest, formerly Chief Pilot of World Airways.

Hertzfeldt testified that following his furlough from World Airways, he applied to virtually every airline in the United States for a flying position. According to Hertzfeldt, the airlines were hiring heavily at the time. With the exception of Pan Am, each airline required him to fill out an application that asked, among other things, whether he had ever been involved in an aircraft accident. Hertzfeldt stated that he responded to this question truthfully on all the applications by answering that he had been the first officer on the World Airways jet that had skidded into Boston Harbor in 1982. Of all the airlines that inquired about prior accidents, only American Airlines asked Hertzfeldt to come in for interviews. American, however, failed to offer Hertzfeldt a position.

As a result of his difficulty in obtaining a flying position, Hertzfeldt testified that he was forced to accept a position as first officer in the Pan Am Shuttle operation. According to Hertzfeldt, Pan Am was not considered a highly desirable airline for which to work: it paid much lower salaries than other airlines and there was a high level of personnel turnover, due to uncertainty about job security. Moreover, being a shuttle pilot was considered even less prestigious, because of the monotony of the job and the low pay. The clear theme throughout this testimony was that Hertzfeldt was forced to accept an undesirable job with Pan Am because no other airline would consider hiring him due to the black

mark on his record created by the World Airways accident at Logan Airport.

Captain Vest's testimony echoed this theme. Vest testified that of the pilots furloughed by World in 1986, Hertzfeldt ranked in the top one-third. Vest stated that he was contacted by numerous airlines about the pilots that World was laying off, but that no airline contacted him about Hertzfeldt. According to Vest, all of these pilots obtained other flying positions within two or three months, with the exception of Hertzfeldt. Moreover, Vest stated that at the time Hertzfeldt finally received a position with the Pan Am Shuttle, that operation was considered to be the lowest prestige position in the industry and Pan Am was so desperate for pilots it was taking any warm body. Vest opined that the only item on Hertzfeldt's record that could account for his difficulty in getting a job was the accident, adding that airlines generally consider it a liability to hire someone who has an accident on his record. Vest admitted, however, that no airline ever told him that it did not hire Hertzfeldt because of the accident.

Like the district court, we find this testimony insufficient as a matter of law for two reasons: (1) it fails to establish a causal connection between Hertzfeldt's involvement in the accident and any injury to his reputation; and (2) it fails to establish any actual damages sustained by Hertzfeldt. Although Vest testified that the other pilots furloughed by World obtained jobs more quickly than Hertzfeldt, no evidence was produced regarding what positions these pilots had held at World, what new positions they had accepted, or how much salary they were receiving. Consequently, there was insufficient evidence to support a reasoned finding by the jury that Hertzfeldt had been treated differently than pilots of similar background and skill who were furloughed at the same time.

More significantly, Hertzfeldt produced no evidence from any of the airlines to which he had applied after being furloughed indicating that it was his involvement in the Logan Airport accident—irrespective of any conclusions about his blameworthiness—that caused them not to offer him a job as a pilot. Put another way, Hertzfeldt failed to link any specific lost job opportunity to the 1982 accident. At best, the evidence introduced was indirect and circumstantial, consisting largely of testimony that it had been difficult to find a job, and that Hertzfeldt had been required to disclose on applications his involvement in an aircraft accident.

We acknowledge that there are no Massachusetts cases directly on point to guide us in determining precisely what quantum of evidence is required to support the type of negligence-based reputation claim made by Hertzfeldt. There are, however, some cases in analogous contexts that provide assistance. First, in the defamation context, Massachusetts requires proof of *actual* harm suffered by plaintiffs alleging injury to their reputations. *See Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 330 N.E.2d 161, 169–70 (1975). In *Tosti v. Ayik*, 394 Mass. 482, 476 N.E.2d 928 (1985), *cert. denied*, 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 393 (1987), the Supreme Judicial Court specifically stated: "where substantial damages are awarded as compensation for earnings allegedly lost as a result of defamation, courts will seek proof that a plaintiff's inability to find comparable work was *actually caused* by a defendant's tortious act." *Id.* 476 N.E.2d at 938 (emphasis added). The *Tosti* court found no such proof in the record before it, contrasting the evidence with that presented in *Faulk v. Aware, Inc.*, 19 A.D.2d 464, 470, 244 N.Y.S.2d 259 (1963), where potential employers had testified they would not hire the plaintiff because of the defamation. *See Tosti*, 476 N.E.2d at 939. We recognize that the close scrutiny given by the *Tosti* court to the evidence was due, in part, to first amendment considerations that are present in a defamation setting. *See id.* 476 N.E.2d at 938, 940. Although such constitutional considerations are not relevant to Hertzfeldt's claim against Massport, substantial foreseeability concerns do exist in this setting and arguably justify similar scrutiny of the evidence.

In addition to the defamation context, Massachusetts also has required a showing

of actual harm by plaintiffs alleging damage to their business reputations as a result of injurious falsehoods uttered in a commercial setting. Specifically, in *Sharratt v. Housing Innovations, Inc.*, 365 Mass. 141, 310 N.E.2d 343 (1974), the court stated: "[w]e assume that it is possible, in some circumstances, to establish proof of an intentional falsehood which is not defamatory." *Id.* 310 N.E.2d at 348. The court continued: "[w]hile such intentional falsehoods may indeed be actionable, recovery would be for the specific, actual and proven harm done to the plaintiff's economic interests." *Id.*

Perhaps the most analogous context is found in *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989). In *Redgrave,* we attempted to apply Massachusetts law to a breach of contract claim brought by an actress against the Boston Symphony Orchestra as a result of the orchestra's decision to cancel a concert series in which the actress was to serve as narrator. The orchestra cancelled the concerts due to its concern about potential disruptions from protestors demonstrating against the actress because of her well-known support for the Palestine Liberation Organization. The actress sued, claiming among other things that the breach of contract injured her professional career and led to a reduction in the number of film and stage offers she received in the immediately ensuing years. In considering this claim, we noted that Massachusetts did not generally recognize reputation claims in breach of contract actions, because the prospect of injury to reputation was not within the reasonable contemplation of most parties when they entered into contracts. We held, however, that if a plaintiff could provide evidence of identifiable lost job opportunities, then a damage award for these lost opportunities would be permissible. *See id.* at 893–94. Applying this standard, we rejected as insufficient Redgrave's anecdotal testimony about having experienced a decline in the quality and/or quantity of film and stage offers she received. We observed that even if the

evidence supported the actual existence of a decline, which was debatable, the decline could have been due to factors other than the orchestra's cancellation of the concert series. The only evidence found sufficient by us was the specific testimony of a theater producer that he had taken into account the orchestra's actions in deciding not to make Redgrave an offer. *See id.* at 896–900.

■ We find the reasoning of *Redgrave* to be applicable to Hertzfeldt's claim for reputation damages. Although *Redgrave* involved a contract claim rather than a tort claim, its concern with what lies within the reasonable contemplation of parties to a contract is closely attuned to the foreseeability concerns that exist in a tort setting. We conclude that Massachusetts courts, at a minimum, would require particular evidence of specific lost job opportunities before they would allow reputation damages in an ordinary negligence cause of action. Hertzfeldt failed to produce such evidence. Consequently, we find that there was insufficient evidence to support the jury's award of damages for lost earning capacity stemming from injury to reputation and insufficient evidence to support any award for emotional distress resulting from the alleged loss of earning capacity.

### 2. Langley

■ Langley's theory of reputation damages differs somewhat from that of Hertzfeldt. Langley testified that upon returning to work at World Airways following the five month post-accident investigatory period, he was ostracized by his fellow workers. Although he continued to fly as a pilot until the mandatory retirement age of 60, Langley stated that people became much cooler towards him. His perception was that they held him responsible for the accident. Because of this perceived ostracism and the resulting emotional distress, Langley testified that he decided not to stay on at World as a second officer after he turned 60, which was an option that World offered to him and to other pilots who reached the mandatory retirement age for pilots. Despite his best efforts to find

a non-flight-related job, Langley stated that he was unsuccessful. This lack of success resulted in a loss of earning capacity and emotional distress.

Two additional witnesses gave testimony that paralleled aspects of Langley's testimony. Captain Vest testified that it was his expectation prior to the accident that Langley would stay at World as a second officer until he turned 70, and that Langley was given the choice to do this if he wished. Vest stated, however, that Langley's attitude towards flying changed dramatically after the accident, and he became quite depressed. Captain Sampair, a long-time friend of Langley, echoed Vest's testimony. Sampair stated that it was his understanding that Langley fully intended to continue flying as a second officer after he turned 60 but that he changed his mind after the accident. Sampair did acknowledge, however, that Langley continued to fly on a regular basis after the accident up until his retirement at age 60, and that he must have been mentally and physically fit to fly during this period.

We agree with the district court, for much the same reasons, that this evidence is insufficient to support Langley's claim for lost earning capacity. No contention was made that Langley did not have the option of staying at World; indeed, the evidence shows that he was given the opportunity to do so. Moreover, a strong inference that he was physically and mentally capable of continuing to fly as a second officer can be drawn from the fact that he resumed flying as soon as possible after the accident and flew steadily for 18 additional months as a pilot until reaching the mandatory retirement age.

The only evidence introduced by Langley was his testimony that he was unwilling to stay because he felt ostracized by his fellow workers and had lost his desire to fly. We agree with the district court that Langley's uncomfortable relationship with his co-workers is not enough to support a claim for lost earning capacity. Significantly, there was no testimony from any fellow workers of Langley that he actually was ostracized by his peers at World. More-over, no evidence of medical or psychiatric treatment was introduced to buttress Langley's claims that he suffered ostracism by his fellow workers or that such ostracism led to sufficient emotional distress to cause him to leave World Airways. *Cf. Tosti*, 476 N.E.2d at 939 (placing significance on the absence of any evidence of medical or psychiatric treatment); *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171, 180 (1982) (requiring evidence of physical harm in claims for negligent infliction of emotional distress). In the absence of such evidence, the jury could do no more than speculate as to the connection between the accident, any damage to Langley's reputation among his peers, and the causes that led Langley to leave World Airways. Given the speculative nature of Langley's allegations, we find insufficient evidence in the record to support his claims for loss of earning capacity and emotional distress resulting from that loss.

## IV. CONCLUSION

The district court ruled, as a matter of Massachusetts law, that the losses stemming from harm to reputation claimed by Hertzfeldt and Langley were not recoverable elements in an ordinary negligence case. The court alternatively held that there was insufficient evidence in the record to support the jury's damage awards.

Although we decline to state definitively our view as to whether Massachusetts would recognize a claim for injury to reputation in an ordinary negligence setting, we affirm the district court on the narrower ground that plaintiffs failed to adduce sufficient evidence that Massport's negligence proximately caused the losses claimed by plaintiffs.

*Affirmed.*

LEVIN H. CAMPBELL, Circuit Judge (concurring).

While I concur fully in the result, I do not join in the court's discussion in part II concerning "Reputation Damages in an Ordinary Negligence Case." I do not join because, as the court points out, plaintiffs'

failure to adduce sufficient evidence on causation is a sufficient reason to deny relief. Our discussion on reputation law, therefore, is dicta. While I admire both the scholarship and the force of this interesting discussion, the dicta it sets forth is clearly not a reflection, institutionally, of the views of this court. The dicta, moreover, is in an area where the Massachusetts courts, not the federal courts, make the law. Insofar as the author seeks to encourage Massachusetts to take a view more expansive than that currently prevailing around the nation (and there is more than a little suggestion of that in the discussion), such encouragement seems to me to belong in a scholarly journal rather than as part of a judicial opinion.