Henry, Bruce R., J.
The plaintiff Brenda Haglund (“Haglund”), in her capacity as the executrix for the estate of her deceased husband, Stephen C. Haglund (“Decedent”), commenced this action against cigarette manufacturer Philip Morris, Inc. (“PMI”), alleging that the nicotine level in PMI’s cigarettes exceeding 0.06 milligrams constitutes a design defect. Given the feasibility of a safer alternative design, i.e., a non-addictive cigarette manufactured through nicotine extraction, Haglund claims PMI breached its implied warranty of merchantability. The case is before this court on PMI’s motion for summary judgment. For the following reasons, PMI’s motion is DENIED.
BACKGROUND
The undisputed facts, as set forth in the summary judgment record and Haglund v. Philip Morris, Inc., 446 Mass. 741 (2006), and as viewed in the light most favorable to Haglund as the non-moving party, are as follows. Humphrey v. Byron, 447 Mass. 322, 325 (2006).
The Decedent was born in July 1948 and began smoking PMI’s Marlboro cigarettes in 1973. He also smoked Winston cigarettes which PMI did not manufacture. He was aware that smoking was addictive and could lead to lung cancer. During his life, the Decedent suffered from diabetes, hyperlipidemia, hypertension, high cholesterol, and obesity. The Decedent died of lung cancer in May 2000.
At the time the Decedent began smoking, all cigarettes contained more than 0.06 milligrams of nicotine.[2] There is currently no federal- or state-imposed cap on nicotine levels in cigarettes.[3] Haglund’s expert, William A. Farone, Ph.D. (“Farone”), lists in his report the ways in which PMI designs its cigarettes to ensure that the “delivery of a dose of nicotine [in each PMI cigarette was] sufficient to create and sustain addiction . . .” Farone Report (September 17, 2007), at 10. Those methods include:
“Manipulation of nicotine levels via cigarette construction technology and tobacco blend selection." Id. at 10-11.
“Increasing nicotine in the vapor phase and/or free nicotine!.]” Id. at 11-13.
“Decreasing particle size through combustion chemistry!.]” Id. at 13-15.
*206 “Increasing inhalability through tobacco processing, including specification of flavorants, additives and smoke chemistry!.]” Id. at 15.
“Development of high-porosity paper, low-pressure drop filtration, rapid burning tobacco, and other characteristics to facilitate rapid and repeated product use[.]” Id. at 15-16.
“Utilizing filter ventilation[.]” Id. at 16-18.
Allen Kassman, Ph.D. (“Kassman”), one of PMI’s experts, denies that PMI manipulates cigarettes in any way, either through their ingredients or construction in order to affect form or delivery of nicotine, and claims that PMI “has employed all commercially feasible technologies to reduce the inherent health risks of smoking.” Kassman Report (October 16, 2007), ¶10.
Through the reports of her experts Farone and Joseph DiFranza, M.D. (“DiFranza”), Haglund proposes an alternative design of cigarettes with a nicotine delivery of 0.06 milligrams or less (“alternative cigarette”), and alleges that the extraction of nicotine has been feasible since before the Decedent started smoking but that tobacco companies chose not to market such cigarettes.[4] According to DiFranza, “(b]ut for the nicotine in cigarettes, no one would become addicted to cigarettes. This is the overwhelming consensus of the scientific and medical communiiy.” DiFranza Supplemental Report (November 30, 2007), ¶4. Therefore, it is unlikely that unaddicted smokers would smoke many more than one alternative cigarette,[5] thereby lowering the frequency of cancer and, in his opinion, creating a different category of cigarettes.[6] Farone states that a market does exist for these alternative cigarettes.
Another of PMI’s experts, Dr. Linda Werling (“Werl-ing”), disputes that there is a minimum dose of nicotine that creates and sustains dependence on nicotine. Kassman opines that “it was not technologically feasible to produce a commercially acceptable cigarette with 0.06 mg of nicotine content or less before . . . [the] [D]ecedent is alleged to have started smoking.” Kass-man Report (October 16, 2007), ¶24. In fact, he states that “[t]here is an ongoing debate in the public health community about the concept of a denicotinized cigarette as a safer product [and] the public health community has long recognized that an essential consideration in the design of cigarettes with lower machine-measured tar and nicotine yields is that they be consumer acceptable.” Supplemental Kassman Report (March 2008), ¶4.
Farone set out an example of nicotine extraction based on a research project PMI undertook in 1955:
a cigarette has about 750 mg of tobacco which is 2-3% nicotine. Using tobacco with 2% nicotine, the entire cigarette would have 15 mg of nicotine. If you use the 95% extraction figure which was documented in Project 2-012 [PMI’s 1955 project], 95% of 15 mg of nicotine leaves .75 mg of nicotine in the entire cigarette. A second extraction (95% of 0.75 mg) would leave .037 mg of nicotine in the entire cigarette. When you smoke a cigarette you generally get 10-20% of the nicotine that is there. . . . More aggressive regimes can get you close to the 20% range. However, under the most extreme compensation conditions, it would be impossible to get any more than half the nicotine. Thus, 50% of 0.037 mg of nicotine in the entire cigarette would result in a cigarette with a maximum nicotine delivery of .019 mg.
Farone Report (September 17, 2007), at 32. Farone pointed out that “the nicotine content could be reduced even further through additional extractions. However, to minimize the number of extractions, tobacco with a much lower nicotine content to start with could be acquired.” Id., see Farone Deposition (January 29, 2008), at 191-92 (explaining that “it may be worthwhile to do it, with a single extraction because you save time, you save labor, you save money by doing that. And since it is relatively easy to select tobaccos with [low nicotine levels] that may simplify the whole procedure”).[7]
Haglund concedes that this alternative cigarette would be unacceptable to established cigarette smokers because they smoke for the pharmacological effects of nicotine. See supra, n.5. Haglund further concedes that there is no evidence that the Decedent himself would have smoked the alternative cigarette if it had been available to him.
DISCUSSION
“The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.” Humphrey, 447 Mass. at 325, quoting Anderson St. Assocs. v. Boston, 442 Mass. 812, 816 (2004); see Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy its burden either by submitting affirmative evidence negating an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989); see Polaroid Corp. v. Rollins Envtl. Servs., Inc., 416 Mass. 684, 696 (1993) (“[B]are *207 assertions and conclusions . . . are not enough to withstand a well-pleaded motion for summary judgment”) .
I. Implied Warranty of Merchantability
“[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.” G.L.c. 106, §2-314(1). Goods are merchantable if they “are fit for the ordinary purposes for which such goods are used . . .” G.L.c. 106, §2-314(2)(c). “A seller breaches its warranty obligation when a product that is ‘defective and unreasonably dangerous,[1] ... for the ‘ [ordinary purposes’ for which it is ‘fit’ causes injury.” Haglund, 446 Mass. at 746 (internal citation omitted) (emphases added).
“ ‘Ordinary purposes’ refers to a product’s intended and foreseeable uses . . . ‘Fitness’ is a question of degree, that primarily, though not exclusively, concerns reasonable consumer expectations.” Id. at 746-47 (internal citations omitted), citing Back v. Wickes Corp., 375 Mass. 633, 640, 642 (1978); see Phillips v. West Springfield, 405 Mass. 411, 414 n.3 (1989) (“The pertinent reasonable expectations are those of the ordinary purchaser of the type who purchases the product in question”). The Supreme Judicial Court has already held in this case that cigarettes “are a product that cannot be used safely for the ‘ordinary purposes’ for which they are fit, namely smoking.” Haglund, 446 Mass. at 750. Thus, “cigarettes cannot be used safely and .. . cigarette use is unreasonable.” Id. at 753; see id. (noting that, when a company “chooses to market an inherently dangerous product, it is at the very least perverse to allow the company to escape liability by showing only that its product was used for its ordinary purpose”).
A plaintiff may premise her implied warranty of merchantability claim “either on the failure to warn, . . . or, as here, on defective design." Id. at 747 (internal citation omitted). “A product ... is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller . . . and the omission of the alternative design renders the product not reasonably safe . . Restatement (Third) of Torts: Products Liability §2(b); see Restatement (Third) of Torts: Products Liability §2, cmt. n (acknowledging that “product defect claim satisfying the requisites of [§2] . . . may be brought under the implied warranty of merchantability provisions of the Uniform Commercial Code”); see also Back, 375 Mass. at 640 (“The Legislature has made the Massachusetts law of warranty congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts §402A (1965)”);[8] see, e.g., Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 22-23 (1998) (applying standard set forth in Restatement (Third) of Torts: Products Liability §2(c) — stating product “is defective because ofinadequate instructions or warnings” to case alleging breach of implied warranty of merchantability premised on failure to warn).
Given the Supreme Judicial Court’s conclusion, above, that cigarette use is unreasonably dangerous, the issue before this court is whether the unreasonableness results from the presence of a design defect which Haglund must establish by proving the existence of a reasonable alternative design. See Haglund, 446 Mass. at 753. Only if Haglund establishes a defective design must she prove that the defective design caused the Decedent’s injury. The structure of the claim in Massachusetts thus necessitates the determination, first, of whether a design defect exists, and, second, of whether that design defect caused the harm.
Haglund points to the presence of nicotine as the defective condition in PMI’s cigarettes, and alleges that by selling these defectively-designed cigarettes containing nicotine, PMI has breached its implied warranty of merchantability; the defect, in turn, so the plaintiff alleges, caused the Decedent’s injury. The safer alternative design that Haglund proposes is a cigarette with less than 0.06 milligrams of nicotine. Haglund asserts that by extracting the nicotine, the alternative cigarette is less addictive, if not non-addictive, and, as a consequence, cigarette use becomes reasonable. See id. at 750 (“An addiction is an ‘[hjabitual psychological and physiological dependence on a substance or practice which is beyond voluntary control’ ” (quoting Stedman’s Medical Dictionary 23 (25th ed. 1990))).
PMI “does not deny . . . that the nicotine in cigarettes is addictive.” Id. Additionally, PMI has admitted “that ‘the technology exists to reduce, but not completely remove, the nicotine content in tobacco,’ and that such technology existed prior to 1973, when the [D]ecedent began smoking . . . [and] that [PMI’sj attempt to market a reduced nicotine cigarette proved unsuccessful.” Id. at 744. In challenging the merits of Haglund’s claim, PMI argues that rather than identifying a design defect unique to PMI’s product, Haglund has improperly contended that all cigarettes are defective. PMI also couches its argument in terms of the element of causation: the defect was not a legal cause of the Decedent’s injury because Haglund cannot prove that Decedent would have smoked the alternative cigarettes; as the Decedent’s death would have occurred even with the existence of the alternative cigarettes, PMI cannot be liable. Finally, PMI disputes that Haglund can establish the feasibility of the alternative cigarette.
A. Unique Defect
Given that all cigarettes contain nicotine, PMI argues that Haglund’s claim cannot proceed because she has failed to identify a unique defect in PMI’s cigarettes. PMI mischaracterizes Haglund’s burden. In *208 Kyte v. Philip Morris, Inc., 408 Mass. 162 (1990), the defendant similarly viewed “the plaintiffs’ warranty claims [as] . . . based on the theory that the sale of standard, everyday cigarettes violates the implied warranty of merchantability.” Id. at 172. The Supreme Judicial Court rejected this view, adopting the plaintiffs’ own view of their claim “that, because of their defective design, [the defendant’s] . . . cigarettes were inherently carcinogenic and addictive.” Id. at 171. The plaintiffs’ design defect claim was therefore proper because they “rel[ied] on a defect or defects specific to [the defendant’s] . . . cigarettes, and not on a claim that all cigarettes are bad.” Id. at 172.
Pursuant to Kyte, for PMI to prevail on this argument, Haglund would have to assert that PMI is liable for breaching the implied warranty of merchantability because all cigarettes are defectively designed. See Restatement (Third) ofTorts: Products Liability §2, cmt. d (“[C]ourts have not imposed liability for categories of products that are generally available and widely used and consumed, even if they pose substantial risks of harm”).[9] While PMI is arguably correct in that all cigarettes contain nicotine, Haglund does not base her claim on that premise.
Just as in Kyte, Haglund’s claim against PMI is specific to PMI’s cigarettes: PMI breached the implied warranty of merchantability because PMI’s cigarettes contain a design defect, i.e., nicotine, that harmed the Decedent; and, as the Supreme Judicial Court reasonably inferred from PMI’s “acknowledgment that nicotine in cigarettes makes smoking addictive],]... its product was consciously designed to induce cigarette dependency . . .” Haglund, 446 Mass. at 750-51 (emphasis added). Farone explains and Kassman disputes the ways in which PMI manipulated the ingredients and construction of its cigarettes in order to create and sustain addiction. Contrast Johnson v. Brown & Williamson Tobacco Corp., 345 F.Sup.2d 16, 20-21 (D.Mass. 2004) (awarding defendant cigarette manufacturer sum-maiy judgment based, in part, on plaintiffs failure to demonstrate that defendant’s cigarettes “deviated from the norm in some untold way” because expert’s declarations that defendant “designed and manipulated . . . cigarettes to deliver doses of nicotine sufficient to create and sustain consumer addiction” and “enhanced the design of the cigarette ... to accelerate the delivery of tar and nicotine” were “utterly devoid of particulars concerning the methods, levels or effects of any enhancements or manipulations” and plaintiff “offer[ed] no supporting evidence, only allegation”). PMI’s argument in this regard, therefore, fails as Haglund has set forth a claim of a defective design which is particular to PMI’s cigarettes and has supported that claim with an expert’s report.
B. Causation
As noted above, the structure of a design defect claim requires the establishment, first of a design defect; only if the plaintiff proves the design contains a defect is her claim that the defect caused her injury potentially actionable. Assuming for purposes of this discussion only that Haglund can establish the first part of her burden, i.e., that nicotine in PMI’s cigarettes constitutes a design defect, she must then demonstrate that the defect “was the proximate cause of the loss sustained.” G.L.c. 106, §2-314, comment 13. PMI argues that, in order to establish proximate cause, Haglund must prove that the alternative cigarettes would have prevented the Decedent’s injury; and that Haglund cannot meet her burden because she has stipulated that the Decedent would not have smoked the alternative cigarettes. PMI again mischaracterizes Haglund’s burden as Massachusetts courts have not applied PMI’s view of causation in the context of design defect cases.
First, in requiring the plaintiff to prove “that the damages complained of were proximately caused by [the design] defect . . . which existed at the time of the sale[J’ the focus is on the defect itself, not on the plaintiffs conduct with respect to the safer alternative design. Fernandes v. Union Bookbinding Co., Inc., 400 Mass. 27, 37 (1987) (emphasis added). Second, with respect to the plaintiffs safer alternative design burden, “ft]he plaintiff need only convince the jury that a safer alternative design was feasible, not that any manufacturer in the industry employed it or even contemplated it.” Haglund, 446 Mass. at 748. It follows, then, that with respect to the plaintiffs proximate cause burden, the plaintiff need not convince the jury that, had a safer alternative design existed, the plaintiff would have used it. A closer examination of the causation element supports this conclusion.
Although “actions for negligence and for breach of warranty impose distinct duties and standards of caret,]” and each action “stands on a much different footing!,]” Colter v. Barber-Greene Co., 403 Mass. 50, 61 (1988), “[a]s with negligence, [the plaintiff] must also prove that [the defendant’s defective] products were — more likely than not — the cause-in-fact, as well as the proximate cause of the injury.” Wasylow v. Glock, Inc., 975 F.Sup. 370, 377 (D.Mass. 1996), citing Kearney v. Philip Morris, Inc., 916 F.Sup. 61, 64 (D.Mass. 1996); Jean v. Waban, Inc., Civil No. 9600694, 1999 WL 1318960 (Mass.Super.Ct. Feb. 24, 1999) [10 Mass. L. Rptr. 91] (Sikora, J.); see Ulwick v. DeChristopher, 411 Mass. 401, 408 (1991) (holding that causation consists of “actual and proximate” cause); see also Restatement (Third) ofTorts: Products Liability §15 ("Whether a product defect caused harm to persons or property is determined by prevailing rules and principles governing causation in tort”).
*209 Under Massachusetts law, proximate cause requires a showing by the plaintiff, first, that the loss was a foreseeable consequence of the defendant’s negligence,[10] second that the defendant’s negligence was a but-for cause of the loss, and third, that the defendant’s negligence was a substantial factor in bringing about the loss. The last two elements relate to the concept of actual causation, or causation-in-fact.
Jorgensen v. Massachusetts Port Auth., 905 F.2d 515, 522-23 (1st Cir. 1990) (footnote added); see Commonwealth v. Carlson, 447 Mass. 79, 83 n.5 (2006) (noting that, while “[t]he term ‘proximate cause’ has fallen into disfavor!,] . . . [Massachusetts] continuéis] to use the term as it has been used in the past, as shorthand for the principle that an actor’s liability is limited to those physical harms that are within the foreseeable risks of the tortious conduct”).
With respect to foreseeability, “[i]t is only the risk which results in the harm that must be reasonably foreseeable, not the precise manner of the accident or the extent of the harm.” Moose v. Massachusetts Inst. of Tech., 43 Mass.App.Ct. 420, 425 (1997). A defendant’s “conduct would constitute the foreseeable cause of the plaintiffs harm unless it appears extraordinary that the conduct should have brought about that harm.” Rae v. Air-Speed, Inc., 386 Mass. 187, 193 (1982). The consideration of foreseeability is objective in nature, such that “[although a failure to [take certain measures] . . . would not cause harm in every case to [a party] ... it certainly could not be said to be extraordinary if harm to those parties arose out of the failure to ’’take those measures." Id.
“The question whether the risk of injury was foreseeable is almost always one of fact.” Id. “Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury.” Mullins v. Pine Manor Coll., 389 Mass. 47, 56 (1983). Here, PMI has already admitted that “ ‘nicotine in cigarette smoke is addictive and that cigarette smoking is addictive,’ that ‘nicotine plays an important role in cigarette smoking,’ that ‘it can be difficult to quit smoking,’ . . . [and] that the risks of cigarette smoking are widely known . . .” Haglund, 446 Mass. at 744. Further, PMI “acknowledg[ed] that the nicotine in cigarettes makes smoking addictive . . .” Id. at 751. The undisputed facts, therefore, establish that the risk of harm resulting from the presence of nicotine in cigarettes — i.e., that the nicotine in cigarettes causes smokers to become addicted and increases their risk of harm — is foreseeable as a matter of law. See id. at 744, 751; see, e.g., Ducharme v. Hyundai Motor Am., 45 Mass.App.Ct. 401, 403 (1998) (“With respect to automobiles, collisions are considered to be reasonably foreseeable uses of the product”).
PMI’s argument that the Decedent’s injury would have occurred even with the existence of the alternative cigarettes arises in the factual causation branch of the analysis. In establishing actual causation, or causation in fact, however, the focus remains on the product’s defect and its effect. See Jorgensen, 905 F.2d at 523, 524. The plaintiff must demonstrate that the design defect in the defendant’s product “produced the plaintiffs disease and death,” as contrasted with “a negligible factor, so slight or so tangential to the harm caused that, even when combined with other factors, it could not reasonably be said to have contributed to the result.” O'Connor v. Raymark Indus., Inc., 401 Mass. 586, 592 (1988) (emphasis added). Unlike the foreseeability element, above, this consideration is subjective in that it requires the plaintiff to “show[] a connection between the defendant’s conduct [e.g., the design defect] and the plaintiffs alleged injuiy [i.e.,] that defendant’s conduct was a but-for cause of [the] injury, . . . and that defendant’s conduct was a ‘substantial legal factor’ in bringing about the alleged harm to the plaintiff.” Jorgensen, 905 F.2d at 524; see Or v. Edwards, 62 Mass.App.Ct. 475, 485 (2004) (holding that “[factual cause requires plaintiff to demonstrate that defendant’s negligence was as a matter of fact a substantial causative factor in bringing about the [harm] . . . The question can be recast in ‘but-for’ terms without change in meaning or likely result”).
The structure of the inquiry in this case, therefore, is whether the presence of nicotine in PMI’s cigarettes, as deliberately manipulated by PMI, in the plaintiffs view, was a substantial factor in causing the Decedent’s harm. By phrasing the inquiry “in ‘but-for’ terms!,]” the question becomes whether the Decedent’s harm would have occurred but for PMI’s deliberate manipulation of the nicotine in its cigarettes. Or, 62 Mass.App.Ct. at 485. Whether the Decedent would have used the alternative cigarette if it had been available is irrelevant to resolving this question.[11]
Moreover, the Supreme Judicial Court has previously employed language suggesting that, even if the plaintiffs causation burden included demonstrating that he would have used the alternative design, that requirement would not apply in warranty cases involving cigarettes. See Cottam v. CVS Pharmacy, 436 Mass. 316, 327 (2002). In failure to warn cases, “Massachusetts law permits the jury to infer that a warning, if properly given, would have been followed . . . [although a party may rebut this inference ...” Id. In Cottam, the defendant pharmacy argued that the lower court improperly excluded testimony “that [the plaintiff] continued to smoke cigarettes despite the health warnings on cigarette packages” as evidence “that, even if [the defendant] had provided a warning about [the drug the defendant dispensed], [the plaintiff] would not have heeded it.” Id. at 326-27.
*210 The Court held that although the presumption that a warning, if given, would be followed is rebuttable, “[t]he decision whether evidence is relevant remains within the sound discretion of the trial judge.” Id. at 327 (alteration in original) (citation omitted). “There is a considerable difference between a long-time smoker’s failure to heed the health warnings on cigarette packages and a failure to heed a [drug] warning about a medical condition that could result in permanent impotence." Id. “Because cigarettes are addictive, many smokers may be physically unable to heed the warnings on cigarette labels.” Id. (emphasis added). In such a case, failure to heed warnings against smoking would be irrelevant. See id.
Thus, under PMI’s formulation of the causation burden, a plaintiff could potentially never prove factual causation in a warranty case involving cigarettes as no smoker could switch to the alternative cigarette, the purpose of which, Haglund points out in her opposition to PMI’s summary judgment motion, is to prevent addiction at the outset. Moreover, the Supreme Judicial Court in this case has already “take[n] judicial notice that, as a for-profit enterprise and a publicly traded company, [PMI] seeks to manufacture, market, and sell cigarettes to the general adult public in a manner intended to attract and retain as many consumers as possible.” Haglund, 446 Mass. at 750. It is arguably the presence of nicotine that brings about this result. See id. at 751. The combination of the Court’s language in Cottam and its findings in Haglund supports the conclusion that, given that the addictive nature of cigarettes arises from the presence of nicotine, no smoker would smoke the alternative cigarettes.
PMI’s argument accordingly fails as a matter of law,[12] not only because the causation element does not place on the plaintiff the burden of proving that he would have used the safer alternative design, but also, even if that burden existed, it could not apply in warranty cases involving cigarettes.
C. Safer Alternative Design
The issue becomes, then, whether Haglund has established that she can prove at trial that the deliberate manipulation of nicotine at a level exceeding 0.06 milligrams in PMI’s cigarettes is a design defect entitling her to money damages. See Flesner, 410 Mass. at 809; Kourouvacilis, 410 Mass, at 716. Haglund has asserted her claim against PMI under G.L.c. 106, §2-314(c). Thus, the question for the jury is, “at a minimum” whether PMI’s cigarettes are “fit for the ordinarily purposes for which such goods are used.” Back, 375 Mass. at 641.
As noted, the Supreme Judicial Court has already held that “any reasonable use of [cigarettes] whatsoever [is] foreclosed by the nature of’ cigarettes themselves, thus cigarettes “cannot be used safely for the ‘ordinary purposes’ for which they are fit, namely smoking.” Haglund, 446 Mass. at 750, 751. Cigarettes cannot be used safely because “cigarette smoking poses serious health risks . . . [and] the nicotine in cigarettes is addictive.” Id. at 750. The Supreme Judicial Court reasonably inferred from PMI’s “acknowledgment that the nicotine in cigarettes makes smoking addictive . . . that [PMI’s] product was consciously designed to induce cigarette dependency in the ordinary smoker, regardless whether any individual smoker becomes addicted to cigarettes.” Id. at 751 (emphasis added). This finding does not preclude Haglund from proceeding to trial, however.
“[T]he focus in design negligence cases is not on how the product is meant to function, but on whether the product is designed with reasonable care to eliminate avoidable dangers . . . [otherwise,] there would be no liability for negligent design of a product which functioned as intended but which was designed in a fashion more dangerous than need be.” Uloth v. City Tank Corp., 376 Mass. 874, 878 (1978). Instead, whether “the product performs as intended, . . . or . . . the dangers are obvious . . . [are] factors [that] should be considered by a jury in evaluating a claim of design negligence.” Id. at 881. “[T]here is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery.” Id.
In “determin[ing] the adequacy of a product’s design!, however,] the jury must weigh multiple factors, including . . . ‘the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.’ ” Haglund, 446 Mass. at 748, quoting Back, 375 Mass. at 642.[13] Haglund’s and PMI’s experts disagree about whether the technology existed to create the alternative cigarette in 1973 and whether a market existed for the alternative cigarette. The jury must resolve these disputes.
Additionally, in resolving these issues, “the balance struck by the juiy is ultimately a judgment about the ‘social acceptability’ of the design.” Id. (emphasis added), quoting Back, 375 Mass. at 642. Based on the understanding of PMI’s cigarettes the Supreme Judicial Court set forth, the alternative cigarette’s limited nicotine content would decrease, if not eliminate, dependency on smoking and, in turn, decrease the health risks that smoking causes. New smokers who try the alternative cigarettes rather than PMI’s cigarettes as currently designed will likely not become addicted and, just as likely, stop smoking altogether after only one or two, thereby lowering their risk of developing a smoking-related illness. See supra, n.5 (concerning parties’ dispute of meaning of “commercial acceptability”). As Haglund’s expert, DeFranza, points out, however, *211 the alternative cigarette would create a different category of cigarettes.[14]
These issues are for jurors to resolve as they balance the social acceptability of PMI’s cigarettes as they are designed against the alternative cigarette, taking into consideration not only the undue cost to PMI as a result of potentially lowered demand for a cigarette with nicotine extracted to below 0.06 milligrams, but also whether it can perform as a cigarette. PMI’s motion for summary judgment is accordingly DENIED.
II. Conflict Preemption
Finally, PMI argues that the doctrine of conflict preemption bars Haglund’s claim against PMI because imposing state law liability for the sale of cigarettes conflicts with Congress’ intent to permit the sale of cigarettes containing nicotine. The Supreme Judicial Court has “assume[d], without deciding, . . . that a tort action has the same regulatory effect as a State law and therefore that it can be preempted in the same manner and to the same degree as a State law.” Sawash v. Suburban Welders Supply Co., Inc., 407 Mass. 311, 315 (1990); Heinricher v. Volvo Car Corp., 61 Mass.App.Ct. 313, 316 (2004); see Cipollone v. Liggett Group, Inc., 505 U.S. 504, 521 (1992) (noting that state “regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy” (citation omitted)). “Unless Congress’s intent to do so is clearly manifested, a court does not presume that Congress intended to displace State law on a particular subject, and will not so conclude.” Boston v. Commonwealth Employment Relations Bd., 453 Mass. 389, 398 (2009). Therefore, preemption “is not favored, and State laws should be upheld unless a conflict with Federal law is clear.” Sawash, 407 Mass. at 315 (quotation omitted); see id. at 315 n.3 (noting that Court’s “References to State law . . . include State tort actions”).
Federal law may preempt state law in three ways: (1) “in enacting federal law, Congress may explicitly define the extent to which it intends to pre-empt state law[;J” (2) “even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government!;]” and (3) “if Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, ... or when the state law ’’stands as an obstacle to the accomplishment and exclusion of the full purposes and objectives of Congress." Id. at 314-15, quoting Michigan Conners & Freezers Ass’n v. Agricultural Mktg. & Bargaining Bd., 467 U.S. 461, 469 (1984), quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941).
Congress is silent on the issue of the amount of nicotine in cigarettes, thus federal law does not preempt this state action in which Haglund seeks to hold PMI liable for manufacturing cigarettes with more than 0.06 milligrams of nicotine. See, e.g., Commonwealth v. College Pro Painters (U.S.) Ltd., 418 Mass. 726, 729 (1994) (holding that, to avoid preemption of its regulations, state must only regulate those areas in which corresponding federal law “has remained silent”). PMI, however, argues that Haglund is, in effect, using state law to ban cigarettes containing more than 0.06 milligrams of nicotine, and Congress has indicated an intent not to ban cigarettes with nicotine. PMI relies on FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000), for its argument. In my view, this case does not support PMI’s position.
In FDA, the defendant cigarette manufacturers challenged the Food and Drug Administration’s (“FDA”) jurisdiction to regulate tobacco products. Id. at 126. Pursuant to its authority under the Food, Drug, and Cosmetic Act (“FDCA”), 21 U.S.C. §301 et seq., the FDA “promulgated regulations intended to reduce tobacco consumption among children and adolescents.” Id. at 125. Relying on “the FDCA as a whole,” id. at 133-43, as well as on “the tobacco-specific legislation that Congress has enacted over the past 35 years!,]” id. at 143-55, the Supreme Court concluded that Congress “created a distinct regulatory scheme for tobacco products, squarely rejected proposals to give the FDA jurisdiction over tobacco, and repeatedly acted to preclude any agency from exercising significant policymaking authority in the area.” Id. at 159-60. Tobacco is “an industry constituting a significant portion of the American economy . . . [and has a] unique place in American history and society . . . [Thus,] Congress could not have intended to delegate a decision of such economic and political significance to an agency” without doing so expressly. Id. at 159-60, 161.
The “distinct regulatory scheme” Congress created “to address the problem of tobacco and health," FDA, 529 U.S. at 144,
among other things, require[s] that health warnings appear on all packaging and in all print and outdoor advertisements, see 15 U.S.C. §1331, 1333, 4402; prohibit[s] the advertisement of tobacco products through “any medium of electronic communication” subject to regulation by the Federal Communications Commission ... see §§1334, 4402(f); require[s] the Secretary of [Health and Human Services] to report every three years to Congress on research findings concerning “the addictive property of tobacco," 42 U.S.C. §290aa-2(b)(2); and make[s] States’ receipt *212 of certain federal block grants contingent on their making it unlawful “for any manufacturer, retailer, or distributor of tobacco products to sell or distribute any such product to any individual under the age of 18, ’ §300x-26(a) (1). ”
Id. at 143-44; see College Pro Painters (U.S.) Ltd., 418 Mass. at 728 (“The touchstone of preemption is congressional intent”).
Thus, in regulating tobacco, Congress has remained silent as to the amount of nicotine in cigarettes; indeed, Congress has not regulated cigarette ingredients at all. See, e.g., Cipollone, 505 U.S. at 523-24 (holding that in determining whether Federal Cigarette Labeling and Advertisement Act 15, U.S.C. §§1331-41, preempted claims, “central inquiry ... is straightforward: . . . ask whether the legal duty that is the predicate of the common-law damages action constitutes a requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion” (second and third ellipses in original)). Accordingly, Haglund’s claim alleging that PMI is liable for causing the Decedent’s death by selling cigarettes with more than 0.06 milligrams of nicotine is not preempted.
Notably, on June 22, 2009, the President of the United States signed into law the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31 (“Act”). See Christopher N. Banthin & Richard A. Daynard, Room for Two in Tobacco Control: Limits on the Preemptive Scope of the Proposed Legislation Granting FDA Oversight of Tobacco, 11 J. Health Care L. & Pol’y 57 (2008) (discussing Act prior to its enactment into law). Although the Act expressly provides that it shall not be construed to “affect any action pending in . . . State . . . court[,]” Public Law 111-31, §4(a)(2), consideration of the Act’s terms are instructive.
The Act authorizes the FDA, inter alia, “to regulate tobacco products under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.),” Public Law 111-31, §3(1); “to set national standards controlling the manufacture of tobacco products and the identity, public disclosure, and amount of ingredients used in such products),]” Public Law 111-31, §3(3) (emphasis added); “to provide new and flexible enforcement authority to ensure that there is effective oversight of the tobacco industry’s efforts to develop, introduce, and promote less harmful tobacco products),]” Public Law 111-31, §3(4); “to regulate the levels of tar, nicotine, and other harmful component of tobacco products[J’ Public Law 111-31, §3(5) (emphasis added); and “to impose appropriate regulatory controls on the tobacco industry).]” Public Law 111-31, §3(8).[15]
In this Act, Congress expressly states that “)n]icotine is an addictive drug),]” Public Law 111-31, §2(3); that “)t]obacco dependence is a chronic disease, one thattypicallyrequiresrepeated interventions toachievelong-termorpermanentabstinence),]” Public Law 111-31, §2(33); that “)b]ecause the only known safe alternative to smoking is cessation, interventions should target all smokers to help them quit completely),]” Public Law 111-31, §2(34); that “it is ... essential that manufacturers, priortomarketingsuch [tobacco] products, be required to demonstrate that such products will meet a series of rigorous criteria, and will benefit the health of the population as awhole, taking into account both users of tobacco products and persons who do not currently use tobacco products),]” Public Law 111-31, §2(36); that, “)u]nless tobacco products that purport to reduce the risks to the public oftobaccouse actually reduce such risks, those products can cause substantial harm to the public health to the extent that the individuals, who would otherwise not consume tobacco products or would consume such products less, use tobacco products purporting to reduce risk),]” Public Law 111-31, §2(37); and that “)i]t is in the public interest for Congress to adopt legislation to address the public health crisis created by actions of the tobacco industry.” Public Law 111-31, §2(29). Congress expressly prohibits the FDA, however, from issuing regulations “banning all cigarettes,” Public Law 111-31, §90 7(d) (3) (A), and “requiring the reduction of nicotine yields of a tobacco product to zero).]” Public Law 11 l-31,§907(d)(3)(B).
The Act also provides that
nothing in this chapter, or rules promulgated under this chapter, shall be construed to limit the authority of a Federal agency . . . , a State or political subdivision of a State ... to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this chapter, including a law, rule, regulation, or other measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age
Public Law 111-31, §916(a)(1). Further, and most significantly, “)n]o provision of this chapter relating to a tobacco product shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State.” Public Law 111-31, §916(b). Thus, even though the Act authorizes the FDA to regulate the level of nicotine in tobacco products, Public Law 111-31, §3(5), it expressly does not preempt state law products liability actions concerning tobacco products. Public Law 111 -31, §916(b). This current state of the law is therefore consistent with this court’s conclusion, above, that Haglund’s claim is not preempted. See Banthin & Daynard, supra at 71, 76-77 (discussing provision identical to Public Law 111-31, §916(b), *213 prior to its enactment, and noting that proposed Act “seeks not to disrupt the role of litigation in tobacco control” because “long-held understanding with respect to FDA oversight is that state common law tort claims create a separate and important layer of public health protection and offer a means for compensating individuals when FDA oversight proves insufficient” therefore this “anti-preemption language in [what is now Public Law 111-31, §916(b)] would help ensure that tobacco litigation would continue to exert each state's unique level of public health protection above and beyond that afforded by FDA oversight” (emphases added)).
Consequently, PMI’s motion for summary judgment is DENIED on this basis as well.
ORDER
For the foregoing reasons, the defendant’s motion for summary judgment is DENIED.

The parties do not dispute that the applicable testing method for nicotine levels is the Federal Trade Commission’s mandatory testing method.

But see Public Law 111-31 (June 22, 2009), discussed infra.

PMI did sell a denicotinized cigarette called “Next.” PMI claims it stopped producing these cigarettes because the poor taste was unacceptable to consumers. Farone views this excuse as a pretext because flavoring technology has been available to develop an acceptable taste.

If as PMI contends, “commercial acceptability is defined as a cigarette that must satisfy the addicted smoker’s nicotine addictionl,]” Supplemental Farone Report (November 29, 2007), ¶11 (emphasis added), then it does not matter that, as Haglund contends, “(u]naddicted smokers would not detect any difference between cigarettes with or without nicotine.” Supplemental Farone Report (November 29, 2007), ¶8.

Haglund disputes the relevancy of this statement, arguing that she has not offered DiFranza as an expert in cigarette design, nor is DiFranza qualified to so testify.

With the May 28, 2008, expert report of Earl A. Werns-man, Ph.D., PMI disputes Farone’s claims regarding tobacco with naturally lower nicotine levels. See Supplemental Farone Report, ¶12 (noting that process “of simply breeding tobacco for nicotine deficiency” was available in the 1960s and that Farone discussed “with Dr. Peter Carlson of Crops Genetic International . . . the breeding of low nicotine tobacco, but this project was not pursued by [PMI]”). Haglund has moved to strike Wemsman’s report as beyond the October 2, 2007, deadline for disclosure of experts. PMI countered that Haglund’s single design defect theory was the failure to extract nicotine from cigarettes and that PMI obtained Wernsman’s report to dispute Haglund’s “new” theory of low-nicotine tobacco. Although Farone mentions low-nicotine tobacco in his original September 2007 report, it appears from Haglund’s opposition to PMI’s motion for summary judgment that its only alternative cigarette design is the extraction of nicotine. Accordingly, Haglund’s motion to strike the expert report of Earl A. Wemsman, Ph.D., is ALLOWED, and, additionally, PMI may move to preclude Haglund from arguing at trial that PMI’s cigarettes are defective for failure to use a low-nicotine tobacco.

The American Law Institute approved in 1998 the Restatement (Third) of Torts: Products Liability which essentially “reaffirms the principle expressed in [§402A of the] Restatement (Second) of Torts . . .” Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 22 (1998).

interestingly, the Tentative Draft of the Restatement (Third) ofTorts: Products Liability provided,
common and widely distributed products such as alcoholic beverages, tobacco, firearms, and above-ground swimming pools may be found to be defective .. . however, courts do not impose liability based on a conclusion that an entire category should not have been distributed in the first instance. That is, courts have not imposed liability for categories of products that are generally available and widely used and consumed, solely on the ground that they are considered socially undesirable by some segments of society.
Wasylaw v. Glock, Inc., 975 F.Sup. 370, 381 (D.Mass. 1996) (emphasis added), quoting Restatement (Third) ofTorts: Products Liability §2 at c at 21 (Tent. Draft No. 2, 1995). In the final version of the Restatement (Third) of Torts: Products Liability, the authors omitted the word “tobacco,” italicized above. The Restatement (Third) ofTorts: Products Liability §2, cmt. d sets forth the corresponding provision:
Common and widely distributed products such as alcoholic beverages, firearms, and above-ground swimming pools may be found to be defective only upon proof of the requisite conditions of Subsection (a), (b), or (c) [of §2]. Ifl, inter alia,] . . . reasonable alternative designs could have been adopted, then liability under §§1 and 2 may attach. Absent proof of defect under those Sections, however, courts have not imposed liability for categories of products that are generally available and widely used and consumed, even if they pose substantial risks of harm. Instead, courts generally have concluded that legislatures and administrative agencies can, more appropriately than courts, consider the desirability of commercial distribution of some categories of widely used and consumed, but nevertheless dangerous, products.

“Unlike negligence liability, warranty liability ‘focuses on whether the product was defective and unreasonably dangerous and not on the conduct of the user or the seller.’ ” Colter, 403 Mass. at 61-62, quoting Correia v. Firestone Tire & Rubber Co., 388 Mass. 342, 355 (1983). “[T]he nature of the decision!, however,] is essentially the same.” Back, 375 Mass. at 642. The “defendant’s negligence” in the warranty context, here, is more accurately expressed as the existence of a design defect in the defendant’s product.

PMI essentially argues that the Decedent’s failure to smoke the alternative cigarettes if they had been available to him was unreasonable, thereby negating the causal connection between the nicotine in PMI’s cigarettes and the Decedent’s harm. As Haglund points out in her opposition to PMI’s summary judgment motion, PMI’s argument is similar to a Correia defense. With this affirmative defense, set forth in Correia v. Firestone Tire & Rubber Co., 388 Mass. 342, 356 (1983), the defendant argues that “the plaintiff is barred from recovery because (1) he violated a duty to act reasonably with respect to a product he knew to be defective and dangerous and (2) that conduct was the cause of the injury." Allen v. Chance Mfg. Co., Inc., 398 Mass. 32, 34 (1983), citing Correia, 388 Mass, at 355-56 & n.12. The defendant “must prove that the plaintiff knew of the product’s defect and its danger, that he proceeded voluntarily and unreasonably to use the product and that, as a result, he was injured.” Id., citing Correia 388 Mass, at 355-57. “This defense differs from the traditional doctrine of assumption of the risk because it combines a subjective element, the plaintiffs actual knowledge and appreciation of the risk, with an objective standard, the reasonableness of his conduct in the face of the known danger.” Id.
In Haglund, the Supreme Judicial Court held that, “[b]ecause the product cannot be used safely in its ordinary-use environment, cigarette merchandising is incompatible *214 with the Correia defense in most circumstances.” 446 Mass, at 751. Therefore, “inmost tobacco liability warranty actions, the Correia defense will be inapplicable," id. at 749, except where “a consumer’s use of cigarettes [is] so overwhelmingly unreasonable as to make the imposition of warranty liability on the merchant fundamentally unfair.” Id. at 753. This notion — albeit arising in a distinguishable context given the purpose of a Correia defense — is consistent with this court’s discussion, below, of Cottam v. CVS Pharmacy, 436 Mass. 316 (2002), and its application to this issue, and supports this court’s rejection of PMI’s argument.

The non-Massachusetts cases on which PMI relies also do not support its argument. In these cases, the plaintiffs’ failure to demonstrate that their decedents would have used the alternatively-designed cigarettes was only one factor in the analysis, and, given their other conclusions, the courts' consideration of the issue was akin to dicta. See, e.g., Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc., 405 F.3d 36, 43-44 (1st Cir. 2005) (holding, first, that plaintiffs’ products liability claim failed because they could not show that “general public in [decedent’s geographical area lacked knowledge about the risks of smoking ... by the time decedent first started smoking ;]”and, second, that plaintiffs did not demonstrate proximate cause because decedent continued to smoke despite “family’s and friends’ repeated admonitions that he give up cigarettes!;]” and rejecting “contention that nicotine’s addictive nature rendered decedent incapable of stopping smoking — a point asserted but undeveloped in [plaintiffs’] brief — [as it was] belied by” evidence that decedent stopped smoking for financial reasons); Labelle v. Philip Morris, Inc., 243 F.Sup.2d 508, 518-19, 521 (D.S.C. 2001) (holding, first, that plaintiffs expert was incapable of demonstrating that proposed alternative design “would have prevented or significantly reduced the risk of injury allegedly caused by the product!;]” and, second, that plaintiff had “no evidence that [decedent] would have chosen to smoke this allegedly safer cigarette” especially as “only evidence on the record regarding [decedent’s] motivation behind choosing a cigarette was price”); White v. R.J. Reynolds Tobacco Co., 109 F.Sup.2d 424, 433-35 (D.Md. 2000) (holding, first, that plaintiffs did not meet burden of showing safer alternative design because subject was beyond their expert’s expertise; and, second, by premising analysis on actual existence of reduced-tar cigarettes, that plaintiffs did not prove defective design próxi-ma tely caused decedent’s injuries because “he smoked ‘full flavor’ ” cigarettes instead); Whiteley v. Philip Morris, Inc., 117 Cal.App.4th 635, 701-02 (2004) (holding, first, that plaintiff failed to demonstrate at trial that design defects in defendants’ cigarettes were substantial factor in decedent’s developing lung cancer; and, second, that plaintiff failed to “cite any evidence ... from which the jury could assume that, were the suggested design changes made, [decedent] would have smoked the safer cigarette, smoked less, or quit smoking altogether” because any such speculation “would run counter to the evidence, which showed that when [decedent] moved from unfiltered to filtered cigarettes, the number of cigarettes she smoked actually increased").

Other factors the jury must consider are “the gravity of the danger posed by the challenged design, [and] the likelihood that such danger would occur . . .” Haglund, 446 Mass, at 748, quoting Back, 375 Mass, at 642. The foreseeability of serious health risks as a result of smoking cigarettes is undisputed. See id. at 750.

The dictionary definition of “nicotine” is “[a] poisonous alkaloid . . . derived from the tobacco plant and used in medicine and as an insecticide.” Webster's II New College Dictionary, 737 (1999). ‘Tobacco,” in turn, is “[a] plant . . . widely cultivated for its leaves, which are used primarily for smoking . . . [and are] dried and processed chiefly for use m cigarettes, cigars, or snuff, or for smoking in pipes.” Webster's II New College Dictionary, 1158 (1999). Finally, a “cigarette” is “[a] small roll of finely cut tobacco for smoking, enclosed in a wrapper of thin paper.” Webster’s II New College Dictionary, 202 (1999). Arguably, then, cigarettes are known to contain nicotine, thus a cigarette containing even a small amount of nicotine would still be a cigarette.
PMI frames the issue differently and has provided this court with Adamo v. Brown & Williamson Tobacco Corp., 11 N.Y.3d 545 (2008), cert. denied, 2009 WL 1975960 (Oct. 5, 2009), to support its argument. In this recent case, the New York Court of Appeals held that the plaintiffs’ design defect claim failed because, although they “presented evidence from which a juiy could find that light cigarettes — cigarettes containing significantly lower levels of tar and nicotine — are ‘safer’ than regular cigarettes, . . . they did not show Uiat cigarettes from which much of the tar and nicotine has been removed remain ‘functional.’ The function of a cigarette is to give pleasure to a smoker; plaintiffs have identified no other function." Id. at 550 (emphasis added). “Both regular and light cigarettes are available on the market, and the enhanced dangers that come from regular cigarettes are well known, but large numbers of consumers continue to prefer regular cigarettes.” Id. “Plaintiffs made no attempt to prove that smokers find light cigarettes as satisfying as regular cigarettes . . .” Id. The Court of Appeals’ decision came after trial.
Rather than follow the reasoning in Adamo, this court agrees with the manner in which the United States District Court of the Western District of Washington handled the question on the defendant’s motion in limine. Kimball v. R.J. Reynolds Tobacco Co., 2006 WL 1148506 (W.D.Wash. 2006). There, the defendant cigarette manufacturer argued that the plaintiff could not “present evidence of alternative cigarette designs that are ‘not cigarettes’ or are safer only because no one would use them.” Id. at *4. The court noted that although the defendant raised an “interesting” point,
it is one that the jury must decide. What is a cigarette? Is it a “Nicotine-Deliveiy Device!]” . . .? Is it a product for inhaling burning tobacco? Some combination of the two? Something else entirely? These questions are important, because [the plaintiff] cannot point to an entirely different product as an alternative design . .. For example, a plaintiff injured in a motorcycle accident cannot argue that if the manufacturer had installed four wheels on the motorcycle, it would have been safer. “Two-wheeledness” is an essential characteristic of a motorcycle. What are the essential characteristics of a cigarette? The court can only hypothesize. The jury will decide the issue, and will thus decide whether any alternative design that [the plaintiff] proffers is a feasible alternative.
Id. (internal citation omitted); see Adamo, 11 N.Y.3d at 551 (comparing functional difference between cigarette and plaintiffs’ proposed alternative to case in which plaintiffs safer design for “quick drying lacquer sealer” made from water base was functionally different from “highly flammable solvent base” because “water-based products take hours longer to dry”). This court thus leaves to the jury the question of whether the alternative cigarette can perform as a cigarette.

‘The Food and Drug Administration (FDA) is extending to December 28, 2009, the comment period for the notice that appeared in the Federal Register of July 1, 2009 (74 FR 31457). In the notice, FDA requested comments on the implementation of the Family Smoking Prevention and Tobacco Control Act (the Tobacco Act). The agency is taking this action in response to a request for an extension to allow interested persons additional time to submit comments.” http://www.regulations.gOv/search/Regs/home.html#doc umentDetail?R=0900006480a34db4 (last checked October 6, 2009).