Agnes, Peter W., J.
The defendant has moved in limine to exclude the testimony of Dr. William A. Farone, a witness proposed by the plaintiff. Based upon the memoranda of law submitted by the parties and the presentations made during the hearings conducted on December 15-16, 2010, the areas of disagreement between the parties have narrowed. The defendant is opposed to any expert witness testimony by Dr. Farone regarding the process of nicotine extrae *420 tion and tobacco flavorant technology on grounds that his proposed testimony is based on speculation and not data that is of the type that scientists ordinarily rely upon, and that the scientific principles he relies upon are not shown to be reliable. See Mass.G.Evid. §702, Note pp. 205-11 (2011 ed.) (five foundations for the admission of scientific opinion testimony); §703 (bases of opinion testimony by experts). Based on the credible evidence presented at an evidentiaiy hearing conducted by this court, I make the following findings of fact and rulings of law.
BACKGROUND
This is a civil action in which plaintiff, Brenda Haglund (“Haglund”), as executrix for the estate of Stephen C. Haglund, brings a claim for breach of warranty and wrongful death against Defendant, Philip Morris Incorporated (“Philip Morris”), based on a design defect theory.[2] This case has been before the Supreme Judicial Court. See Haglund v. Philip Morris, Inc. 446 Mass. 741 (2006). The background facts are set forth in the SJC’s opinion and in a subsequent decision by this court denying the defendant’s motion for summary judgment. See Haglund v. Philip Morris, Inc., 26 Mass. L. Rptr. 205, 2009 WL 3839004 (Superior Court 2009) (Henry, J.).
In Haglund, the Supreme Judicial Court considered whether, in a cigarette product liability case based on a theory of breach of the implied warranty of merchantability for defective design, the manufacturer may assert as an affirmative defense that the plaintiff knew that the product was defective and dangerous, but went ahead and used it anyway. Id. at 749. This defense has come to be known as the Correia defense. See id. at 746, citing and discussing Correia v. Firestone Tire and Rubber Co., 388 Mass. 342, 354-55 (1983), quoting Restatement (Second) of Torts §402A comment c (1965).
In answering that question, the Supreme Judicial Court made certain determinations and observations that may be relevant to questions yet to be determined in this litigation. First, the Court took judicial notice of the fact that “as a for-profit enterprise and a publicly traded company, Philip Morris seeks to manufacture, market, and sell cigarettes to the general adult public in a manner intended to attract and retain as many consumers as possible. Philip Morris does not dispute that its efforts to market and sell its cigarettes to the broad general adult public is anything other than robust.” Haglund, 449 Mass. at 750. Second, the Court acknowledged that “Philip Morris readily admits, cigarettes are a product that cannot be used safely for the ‘ordinary purposes’ for which they are fit, namely, smoking.”[3] Id. Third, The Court noted that the nicotine in cigarettes makes smoking addictive, and that the defendant’s product was designed to cause smokers to become addicted.[4] Because there is no such thing as a safe cigarette, the Supreme Judicial Court reasoned that “[t]he social policy that animates the Correia defense—to encourage reasonable use of products by consumers—cannot be accomplished. The legislative intent of our warranty laws would be sidestepped were the manufacturer of cigarettes permitted routinely to escape all liability merely by proving that the plaintiff was an ordinary consumer who used its products in a manner readily foreseeable.” Haglund, 449 Mass. at 751.[5]
Based on the decision by the Supreme Judicial Court in Haglund and the pleadings and the discovery of which this court is aware, the plaintiffs theory of recovery for breach of the implied warranty of merchantability is that when the plaintiffs decedent began smoking, defendant Philip Morris violated the law by making a conscious choice to design, manufacture and market cigarettes with levels of nicotine that were addictive and with knowledge of their dangerous properties when it was feasible for the defendant to have used a safer, alternative design, namely the so-called non-nicotine cigarette. Id. at 747-48 (citations and quotations omitted). In Haglund, the Supreme Judicial Court instructs that in making this determination “the jury must weigh multiple factors, including the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.” Id. at 748 (quotation omitted).[6] Massachusetts law requires that if the plaintiff succeeds in establishing the existence of a design defect, recovery for breach of the implied warranty of merchantability requires her to shoulder a second burden, namely, that the defect was the legal cause of the loss sustained by the decedent. See G.L.c. 106, §2-314.[7]
More specifically, Haglund alleges that when Stephen Haglund began smoking, Philip Morris could have implemented a “safer reasonable alternative design: a non-addictive nicotine cigarette through nicotine extraction,” and that if it had done so, Haglund would not have become addicted to cigarettes and would not have developed lung cancer.[8] The plaintiff s position on the safer alternative design has changed as this litigation has progressed. Since the summary judgment proceeding, the plaintiff has adjusted her definition of the non-nicotine cigarette and now, through her experts, seeks to prove that a cigarette with 0.003 mg of nicotine would not be addictive and it was technically feasible for Philip Morris to have made such a cigarette at the time Philip Haglund began smoking.
FINDINGS OF FACT
Dr. William A. Farone has an undergraduate degree in Chemistry from Clarkson University in New York. He also has a Masters of Science in chemistry from Clarkson. He received a Ph.D. in Physical Chemistry from Clarkson in 1965. See Declaration of Support of *421 William A. Farone, Ph.D. in Support of Plaintiffs Opposition to defendant’s Motion for Summary Judgment. Dr. Farone was employed by the defendant from 1976 to 1984. He was employed as an Associate Principal Scientist and then was promoted to the position of Vice-President and was the Director of Applied Research and Development. He holds patents where extraction of chemicals from substances is the key feature. In his work for the defendant, Dr. Farone was involved in some of the defendant’s programs to extract nicotine from cigarettes and to then reconstitute the tobacco leaf into a form that could then be used to make cigarettes with a lower level of nicotine. Dr. Farone has extensive experience in the published research concerning the removal of alkaloids like nicotine from tobacco, and first-hand knowledge of the existing laboratory procedures and industrial processes for the removal of nicotine from tobacco, as well as the procedures in use by the defendant dating back to the time when the plaintiffs decedent began smoking.
Dr. Farone is the founder and President of Applied Power Concepts. This company develops technology to remove toxic materials from the atmosphere and environment. The company makes chemicals that treat pollution on sites or by replacing toxic materials with other materials that are environmentally more friendly. Dr. Farone’s present work as a chemist involves the use of solvent extraction in a variety of settings including food products and consumer health products. Dr. Farone has marketed extraction technology that has been used on tobacco. Dr. Farone is an expert in the use of the solvent method of extraction in both the industrial and consumer product settings.
One method used by the defendant to extract nicotine from cigarettes is the so-called solvent method. Under this method, tobacco leaf and stems are ground up and placed on a wire mesh which is then placed in a water solution which washes elements out of the tobacco including nicotine. Chemical flavoring and binding elements can then be added back to the web base to produce reconstituted tobacco leaf. The process is similar to making paper. The baseweb is made up of the non-soluble parts of tobacco along with additives that may be included to improve flavor and the structure of the product.
I credit Dr. Farone’s testimony that a method known as countercurrent extraction is in widespread use to remove liquids from liquids and chemicals from substances like cranberries and mushrooms without crushing the item to which the extraction process is directed. Countercurrent extractors are used in industry for large volume extractions. Dr. Farone gave an example of the use of the countercurrent extraction method as far back as 1958. See exhibit 22 pp. 757, 759 (text book used by the witness in 1958). Dr. Farone conceded that by using the extraction method you cannot succeed in removing 100% of an ingredient, but I credit his testimony that by successively passing the substrate through the appropriate solvent, under appropriate conditions, it is possible to reduce the percentage of ingredients like nicotine down to whatever level is desired. Of course, this process does not provide assurance that the resulting product can then be used for any of the purposes that the original product was used for.
I credit Dr. Farone’s testimony that the basic technology for removing nicotine from tobacco has been known by the defendant and in the defendant’s industry since the early part of the twentieth century. As Dr. Farone has previously stated, “(t]he basic process is predicated upon the fact that the nicotine in tobacco is a soluble substance which can be ‘washed’ away through the use of a solvent.” See exhibit 6. It is his opinion that because nicotine is soluble, successive extraction methods will reduce its presence down to a few molecules. The basis for his opinion is the law of Thermodynamics. As Dr. Farone put it, “(t]he thing that it’s related to in the subject of thermodynamics is equilibrium distribution of the chemical. There’s always an equilibrium distribution between the thing that you’re extracting and the extracting solvent. Even when the material is bound, so-called bound to the surface, that binding simply means that there’s a greater force of attraction that you would normally have, and you can still establish an equilibrium and you can still find ways to decrease the way—the strength of which that it’s bound. So thermodynamics is a veiy powerful law that we use all the time in physical chemistry and in chemical engineering, and it predicts that given enough time with enough solvents, you should be able to remove it [nicotine] down to any predescribed level you want, providing you have a treatment for the substrate, like keeping it wet, that doesn’t allow the material [nicotine] to be trapped so that you can’t have access to it ... So it’s simply a matter of understanding the system and understanding what solvent you need to use to create that equilibrium distribution between the substrate and the extracting solvent.” Dr. Farone used this scientific principle to conduct extractions at Clarkson University in 1958. As an example of this process, Dr. Farone cited the liquid extraction method described in the Hind patent (exhibit 15) and the Stanley and Clark patent (exhibit 16).
Dr. Farone found support for his view that the nicotine level in delivered smoke, i.e., the smoke produced by the burning of the tobacco in a lit cigarette and sometimes known as the “FTC” level, could be reduced to 0.003 mg per cigarette in exhibits 10 and 11 which are monthly progress reports submitted to the defendant by its scientists in 1955. Exhibit 10 discusses the impact of dipping burly tobacco in heated water followed by drying it at 220 degrees Fahrenheit for twenty minutes. The data suggests that the original sample of tobacco had 3.53% of nicotine. *422 When dipped in water at 110 degrees Fahrenheit the percentage of nicotine in the sample dropped as follows: (1) to 1.18% after one minute, (2) to 0.60% after five minutes, and (3) to 0.27% after ten minutes. Exhibit 11 also contains data about the nicotine reductions achieved by dipping burly tobacco in heated water at various temperatures, and reports 95% of nicotine was reduced after a ten-minute dipping.[9] Dr. Farone’s opinion is that there is no reason why successive applications of this method or dipping for longer periods of time could not produce even greater reductions of nicotine so as to achieve a level of no more than 0.003 mg in delivered smoke. See also exhibit 15 (this exhibit contains an early Philip Morris patent for using a solvent to remove nicotine from tobacco) and exhibit 16 (an improvement on the process described in exhibit 15 in terms of adding ingredients back to the tobacco after nicotine is extracted). See also exhibits 17, 18 and 19 (discussions by officials at Philip Morris, including a person the witness used to work for about building a pilot plant to carry out nicotine extraction).
During the time Dr. Farone worked for the defendant, it was recognized that 80-90% of the nicotine could be removed from tobacco leaf by the use of the ammonia and steam extraction method. See exhibits 20-23. Although some of the solvents that might be selected to use in the solvent extraction process are themselves, at certain levels, toxic, within the limits established by federal law toxic solvents are used in a variety of extraction processes for products that are consumed by humans. Chemical reactions can be introduced into the process to transform toxic solvents into harmless byproducts. In terms of particular outcomes of the solvent extraction method used on tobacco, Dr. Farone described one experiment in which 94.1% of the nicotine was removed from a full flavor blend of tobacco after one extraction. See Exhibit 23a (Bates #2021559557). Dr. Farone also relied in part on evidence in the form of a videotape (exhibit #32) which shows the process of grinding up tobacco, bathing it in liquid, introducing additives and drying it to produce reconstituted leaf. In the opinion of Dr. Farone, the extraction technique illustrated in exhibit 32 was available to the defendant in the 1960s and would have enabled the defendant to produce a cigarette entirely out of reconstituted tobacco leaf.
Dr. Farone reviewed all of the reliance documents used by the defendant’s expert, Dr. Kassman (exhibits 1A to 10b), to support Dr. Kassman’s opinion that it is not possible to reduce the nicotine levels in delivered smoke from a single cigarette to 0.003 mg Dr. Farone observed that the data relied upon by Dr. Kassman lacks a measure of precision because the reductions of nicotine reported in the papers was not replicated. The documents describe “single off events." He also explained that the industry standard method for measuring the amount of nicotine left in tobacco after extraction is not pyrolysis but extraction. “Since the inception of tobacco, people have extracted and measured the amount of nicotine by extraction. All of the standard methods for analyzing the amount of nicotine that’s in tobacco are extraction methods. All the validated methods that are used by regulatory agencies, and everybody, it’s all done by extraction.” He explained further that this means a solvent is used to extract nicotine and an instrument is then used to measure the amount of nicotine that was extracted. In the reliance documents in question, on the other hand, the scientists used at least three different forms of pyrolysis or burning to measure the amount of nicotine remaining after extraction. See, e.g., tab 115 of the defendant’s Hearing Documents (Bates 2022257141). At one point there is a reference to pyrolysis which is technically burning without combustion, i.e., burning in the presence of a gas like helium versus air. In another place there is a reference to using air blowing through the tobacco. In a third place, there is a reference to burning with combustion. Dr. Farone explained that when methods such as pyrolysis are used to measure the nicotine remaining in tobacco after extraction the tobacco is heated up or burned and instruments such as gas chromatographs are used to measure the nicotine content of the resulting vapors. However, in heating up the tobacco some of the actual tobacco may combust and chemical reactions may occur that affect the measurement of the remaining nicotine.
I credit Dr. Farone’s testimony that it is standard practice in analytical chemistry to make three determinations, i.e., to do “triplicates,” “(b)ecause if you do three determinations on something, you can get a standard deviation and get a rough idea of how different they are. If you do only two, you can only get an average. In connection with the defendant’s reliance documents, only one measurement was taken that by hypothesis could not be replicated because the sample was consumed. Dr. Farone leveled the same criticism at the test results contained in exhibit 10A (tab 112 of the defendant’s Hearing Documents (Bates 2001271137)). Dr. Farone did not dispute that there is a phenomenon of nicotine binding to protein such as described in exhibit 10B and 113 (tab 113 of the defendant’s Hearing Documents (Bates 2024845328)), but opined that the data relied upon by Dr. Kassman is not reliable in measuring the amount that remains. Moreover, Dr. Farone explained that the available data suggests that the process that leads to nicotine becoming trapped inside tobacco leaf is the result of the drying or curing process and that this can be overcome by keeping the tobacco wet during extraction. I credit Dr. Farone’s testimony that the scientifically reliable, industry-wide, replicable method used to measure the level of nicotine that remains in tobacco after the use of the solvent extraction method to remove the nicotine is extraction and not pyrolysis on other heating or combustion methods.
*423 Dr. Farone also discussed the hypothesis of Dr. Kassman as to why it is not possible to reduce the amount of nicotine in delivered smoke in a cigarette to 0.003 mg First, there is the view that there are other chemicals in tobacco that when heated will produce nicotine. See exhibits 10b para. 2 and 8 p. 3. This hypothesis has not been proven. Second, there is the view that the nicotine in tobacco binds to proteins in the tobacco and is left behind after all attempts to remove it. This hypothesis is plausible, and there is some evidence that supports it. The test results in Table 1 of exhibit 116 (so-called Pickworth paper) are consistent with the phenomenon of bound nicotine. Dr. Farone further agreed that the data contained in exhibit 23 (tab 106 in Hearing Notebook) is also consistent with the phenomenon of bound nicotine. However, there is no data which suggests whether there is any minimum level of bound nicotine after multiple extractions, and no data that suggests that despite the phenomenon of bound nicotine it is not possible to reduce the amount of nicotine in delivered smoke to 0.003 mg or below.
I credit Dr. Farone’s testimony that there are research documents and data which support the view that at the time the plaintiffs decedent began smoking the defendant could have produced a cigarette with a nicotine level of 0.0001%. See exhibits 10 and 10c. (Document dated December 14, 1987 and found at Tab 115 of the Defendant’s Hearing Documents (Bates 2022257142).) For example, Dr. Farone explained that the data in the December 14, 1987 report of D.C. Watson to R.H. Cox indicates that after 12 extractions the percentage of nicotine in the sample of tobacco was reduced to 0.0001% or 0.00075 milligrams of total nicotine. Assuming conservatively that 50% of that is delivered to the smoker, the result is far below the level of 0.003 mg which is assumed to be the level below which a person will not become addicted. This result holds even if you assume that the level of nicotine as measured by pyrolysis is greater as the data suggests.
Dr. Farone also testified that the poor flavor associated with low nicotine tobacco or denicotinized tobacco could be corrected by the defendant based on its expertise in adding flavors to low nicotine products like it did when it introduced Merit cigarettes in 1975. While I credit his testimony that at the time the plaintiffs decedent began to smoke it was feasible for the defendant to have used de-nicotinized tobacco to create and produce a product from which tobacco could be smoked and that in physical appearance resembles an ordinary cigarette, I do not believe he is qualified to testify nor that there is a basis in the record before me for a witness to testify that such a product would taste like a regular cigarette such as a Marlboro, that it would smoke like a Marlboro, or that it would be accepted and purchased by cigarette smokers today or in the past. It may be true, as Dr. Farone stated, that 75% of Marlboro smokers rated the low tar, low nicotine Merit cigarettes first introduced in 1975 as comparable in taste and flavor to Marlboro cigarettes, see exhibits 24-28, but there is insufficient data in the record to make the leap to offer expert witness opinion testimony about how smoking consumers would view the de-nicotinized product. While Dr. Farone has the education, training and experience to testify as an expert witness on the subject of removing toxic materials used in the extraction process from the products extracted and the processes for adding flavor back to tobacco which has undergone nicotine extraction, I do not find that Dr. Farone is qualified by his education, training and experience to offer any opinions about how a de-nicotinized product would taste or smoke. Nor is he qualified to offer any opinions that smokers of ordinary cigarettes (i.e., those containing the amount of nicotine associated with Marlboro cigarettes or comparable brands) would regard the de-nic-otinized product as a cigarette or a product that is comparable to an ordinary cigarette.
Dr. Farone concedes that although he has been an expert for the plaintiff since 2001, he has not produced a cigarette with a level of nicotine in delivered smoke of 0.003 mg or less.
I credit Dr. Farone’s testimony that the so-called Pickworth paper, see exhibit 116, does not mean that a cigarette cannot be made so that the nicotine level in delivered smoke will be below 0.07%. In particular, with reference to exhibit 116, p. 358, table 1, which indicates that there were 0.07 milligrams of nicotine in delivered smoke in de-nicotinized cigarettes which were measured as having 0.0% nicotine content, the paper indicates that the cigarettes in question were not designed to be nicotine free, but rather, as the paper states “to contain and deliver virtually no nicotine.” Moreover, I credit Dr. Farone’s testimony that the amount of moisture in tobacco is essential to the effectiveness of the solvent method of extraction, and the absence of any information about this variable in the data reported in the Pickworth Paper, exhibit 116, limits the conclusions that may be drawn from the data.
There also was some credible testimony from Dr. Allen Julius Kassman who has been designated by the defendant as an expert witness. He was employed by the defendant during most of the years between 1972 to 2002. For a time after he left the defendant’s employment, he worked with and for Dr. Farone. He held a variety of positions including scientist, research scientist, project leader and manager of the Physical Research Division. He holds a PhD. in physical chemistry. Over his years of employment with the defendant, he supervised hundreds of employees. He is very familiar with project ART (Alkaloid Reduced Tobacco, see exhibit 106). Dr. Kassman disagrees with Dr. Farone and does not believe it is possible to produce a cigarette with a level of nicotine in delivered smoke no greater than 0.003% at the time the plaintiffs *424 decedent began smoking. His opinion is based on the view that solvents used in extraction alter tobacco leaf (e.g., bad taste) and the phenomenon of bound nicotine will prevent the removal of all of the nicotine. Dr. Kassman discussed the history of solvent extraction in the tobacco industry from the 1950s through the 1970s. See exhibits 101 and 102. By the 1970s it was possible to extract over 90% of the nicotine from a cigarette. For example, there is data suggesting that by dipping tobacco in heated water for 10 minutes removes up to 95% of the nicotine, but leaves it with “poor smoking characteristics.” Exhibit 103. See also exhibit 104. Dr. Kassam testified that the state of the defendant’s knowledge and capacity in 1966 is reflected in exhibit 105 which indicates in part that it was possible to reduce the amount of nicotine in delivered smoke by 95% but the amount of nicotine in delivered smoke was still above 0.075, well above 0.003.mg.
Dr. Kassman disagreed with Dr. Farone on the feasibility of using base web material to produce a product that can be made into cigarettes. See exhibit 117. Dr. Kassman’s view is that nicotine becomes trapped in the large molecules of the tobacco leaf as it ages and is cured and once it is bound there is no solvent that can remove all of it.
Dr. Kassman was unable to point to any experiments in his reliance documents in which serial extractions were used to maximize the amount of nicotine removed from tobacco as in the laboratory results in exhibit 10 relied upon by Dr. Farone. He did point to the reference in exhibit 112 to “extensive batch extractions” using various solvents, but conceded that there is no indication of the number of extractions. He also conceded that the experiments described in exhibit 110 which involved six extractions were not repeated. He further conceded that experiments were not done to try to hydrate cured tobacco and then employ solvent extraction techniques to remove so-called bound nicotine.
While Dr. Kassman is of the view that there are insurmountable problems involved in making cigarettes entirely out of reconstituted leaf, namely bad taste and problems with structure and firmness, he could not point to any reliance documents to support this view.
DISCUSSION
I. Legal Framework Governing Expert Witness Testimony
The proponent of expert witness testimony must establish five foundation requirements before the expert testimony will be admitted. Commonwealth v. Barbosa, 457 Mass. 773, 784 (2010), and cases cited. The foundation requirements are that (1) the testimony will assist the trier of fact, see Commonwealth v. Francis, 390 Mass. 89, 90 (1983); (2) the witness is qualified as an expert in the relevant area of inquiiy, see Commonwealth v. Frangipane, 433 Mass. 527, 535-36 (2001); (3) the facts or data in the record are sufficient to enable the witness to give an opinion that is not merely speculation, see Sevigny’s Case, 337 Mass. 747, 751 (1958); (4) the expert opinion must be based on a body of knowledge, a principle, or a method that is reliable, Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994); and (5) the expert has applied the body of knowledge, the principle, or the method in a reliable manner to the particular facts of the case, Commonwealth v. Patterson 445 Mass. 626, 645-48 (2005). See Mass.G.Evid. Section 702, Note. “Where the motion in limine challenges the reliability of the expert’s opinion, the judge must perform the role of ‘gatekeeper’ to insure that the expert’s opinion meets a minimum standard of reliability.” Barbosa, 457 Mass. at 783. In our common-law system, the admission of expert testimony is largely within the discretion of the trial judge. Commonwealth v. Richardson, 423 Mass. 180, 182 (1996). See also Daubert, 509 U.S. at 594 (“The inquiiy envisioned by Rule 702, we emphasize, is a flexible one”).
In assessing whether an expert witness should be allowed to testify, the governing standards established by the Supreme Judicial Court and reflected in the Mass.G.Evid. §§702-05 (2011 ed.) indicate that the question is not whether the court believes or accepts the opinions or theories offered by the expert. Moreover, the mere fact that experts disagree about the fundamental elements of their expert witness opinion testimony—for example, in this case with regard to whether it was possible for the defendant to have reduced the amount of nicotine in delivered smoke to 0.003 mg per cigarette through the use of solvent extraction at the time when the plaintiffs decedent began to smoke—does not mean that only one of the experts should be permitted to testify at trial. Finally, an expert such as Dr. Farone is not prohibited from offering opinions based on the process of extrapolation from existing data (namely data contained in research reports in evidence in this case carried out at the defendant’s direction) so long as the opinions rest on reliable scientific principles.
II. Specific Objections in This Case
Philip Morris argues that Dr. Farone should not be permitted to testify as an expert witness and offer the opinion that at the time the plaintiffs decedent began smoking the defendant had the ability to produce the so-called de-nicotinized cigarette, i.e., a cigarette which produced no more than 0.003 mg nicotine in delivered smoke. The defendant has cited a number of prior cases in which for various reasons Dr. Farone was not allowed to testify as an expert witness relating to the addictive properties of nicotine, the commercial feasibility of producing the so-called de-nicotinized cigarette, and the scientific risks associated with smoking. These are not subjects he is being asked to opine about in this case. It should also be noted that Dr. Farone has been qualified to offer testimony sim *425 ilar to, if not identical to what he proposes to opine about in this case in other judicial proceedings. See, e.g., Fabiano v. Philip Morris, Inc., 29 Misc.3d 395, 909 N.Y.S.2d 314 (Supreme Court 2010) (although summary judgment is granted to the defendant tobacco companies in a defective design suit based on the Court of Appeals decision in Adamo v. Brown & Williamson Tobacco Corp., 11 N.Y.3d 545, 872 N.Y.S.2d 415, 900 N.E.2d 966 [2008], rearg. denied, 12 N.Y.3d 769, 879 N.Y.S.2d 26, 906 N.E.2d 1058, cert. denied, 130 S.Ct. 197 [2009], the New York Supreme Court acknowledges that Dr. Farone’s affidavit concerning the feasibility of the de-nicotinized cigarette was admitted into evidence); Clinton v. Brown & Williamson Holdings, Inc., 498 F.Sup.2d 639, 646-48 (S.D.N.Y.2007). See also Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 13 (D.Mass. 2010).
III. Specific Rulings of Law
In this case, Dr. Farone is qualified by his education, training, and experience to offer opinions (1) on aspects of physical and analytical chemistry, on the subject of commercial cigarette production, (2) on the general properties of various types of tobacco, (3) on the industrial uses of extraction and related techniques for removing chemicals and other elements from food products and tobacco and, in particular, on the following subjects: (4) the methods of removing nicotine from tobacco including the method known as solvent extraction; (5) the state of the defendant’s knowledge of this process and its limits, if any, as of the time the plaintiffs decedent began to smoke and up until the most recent reports addressing this subject which have been produced in discovery; (6) that the defendant had the technology and knowledge as of the time the plaintiffs decedent began to smoke to extract nicotine from tobacco to the point where the amount of nicotine in delivered smoke would not exceed 0.003 mg per cigarette; and (7) that the defendant had the technology and knowledge to improve the taste and structural quality of low tar and low nicotine tobacco as evidenced by the Merit cigarette product. However, Dr. Farone is not permitted to offer any opinions as to (1) the financial cost to the defendant of designing and producing the de-nicotinized product, (2) the specific qualities of such a product including its taste, its smoking characteristics, or its acceptance by smoking consumers, and (3) the adverse consequences to the product and to the consumer, if any, that would result from the production of such a product including the impact of producing and selling this product on the defendant’s business or market share.
ORDER
For the above reasons and subject to the more specific rulings of law set forth above, the defendant’s motion in limine is DENIED.

Haglund also seeks punitive damages.

The Supreme Judicial Court further observed that “[t]he record discloses two inherent dangers of smoking cigarettes that Philip Morris does not deny. First, cigarette smoking poses serious health risks. We have previously taken judicial notice of a report by the Surgeon General of the United States released in May 2004, that ‘presents persuasive evidence that smoking [cigarettes] harms nearly every organ of the human body, causes many diseases and reduces the health of smokers in general.’ Aspinall v. Philip Morris Co., 442 Mass. 381, 388 n.16 (2004). See Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125 (2000) (“one of the most troubling public health problems facing our Nation today: the thousands of premature deaths that occur each year because of tobacco use”). Philip Morris concedes that ‘smoking causes serious disease, and there is no such thing as a safe cigarette.’ ” Haglund, 449 Mass. at 750.

“The second danger of cigarette smoking is that the nicotine in cigarettes is addictive. An addiction is an ‘[h]abitual psychological and physiological dependence on a substance or practice which is beyond voluntary control.’ Stedmaris Medical Dictionary 23 (25th ed. 1990). See Food & Drug Admin. v. Brown & Williamson Tobacco Corp., supra at 138, citing United States Department of Health and Human Services, Public Health Service, The Health Consequences of Smoking: Nicotine Addiction 6-9, 145-239 (1988) (’concluding that tobacco products are addicting in much the same way as heroin and cocaine, and that nicotine is the drug that causes addiction’). A reasonable inference from Philip Morris’s acknowledgment that the nicotine in cigarettes makes smoking addictive is that its product was consciously designed to induce cigarette dependency in the ordinary smoker, regardless whether any individual smoker becomes addicted to cigarettes.” Haglund, 449 Mass. at 750-51.

The Court also explained why the plaintiffs stipulation of “knowing unreasonable use” of cigarettes was not fatal. “On the record before us, the plaintiffs stipulation restates the obvious: that cigarettes cannot be used safely and therefore that cigarette use is unreasonable. The stipulation that the decedent was aware of the well-publicized health risks of cigarettes merely places him in the same position as the ordinary consumer or potential consumer of cigarettes. Without more, it is insufficient to justify dismissal of the defective design warranty claim.” Haglund, 449 Mass. at 753. At the same time, the Court noted that the Correia defense may come into play when “a consumer’s use of cigarettes may be so overwhelmingly unreasonable as to make the imposition of warranty liability on the merchant fundamentally unfair.” Id. at 753. The Court left open whether the evidence adduced at trial would make the Correia defense applicable in this case.

The issue that ultimately may be at the heart of this litigation is whether, assuming a non-nicotinized cigarette could have been produced at a reasonable cost at the time the plaintiffs decedent began smoking, is the determination of “the adverse consequences to the product and to the consumer that would result from an alternative design,” Haglund, 449 Mass. at 748, based on the need to satisfy an addicted smoker’s nicotine addiction or simply based on the need to resemble the taste of an ordinary nicotinized cigarette. See Haglund v. Philip Morris, Inc., 26 Mass. L. Rptr. 205 *5 (Superior Court 2009). What the Supreme Judicial Court has determined is a question of fact, the Court of Appeals of New York views as a question of law in the sense that it regards the non-nicotinized cigarette as not a cigarette at all. Adamo v. Brown & Williamson Tobacco Corp., 11 N.Y.3d 545, 872 N.Y.S.2d 415, 900 N.E.2d 966 (2008), cert. denied, 130 S.Ct. 197 (2009).

In denying the defendant’s motion for summary judgment, this Court also rejected the defendant’s preemption argument because “Congress is silent on the issue of the amount of nicotine in cigarettes,” and thus “federal law does not preempt a state action in which a plaintiff seeks to hold *426 a cigarette manufacturer liable for manufacturing cigarettes with more than 0.06 milligrams of nicotine.” Haglund v. Philip Morris, Inc., 26 Mass. L. Rptr. 205 *10 (Superior Court 2009). The defendant has not sought to revisit this issue on grounds that liability for not producing the so-called non-nicotinized cigarette with 0.03 mg of nicotine would violate federal law.

There is evidence in the summaiy judgment record that “[a]t the time the Decedent began smoking, all cigarettes contained more than 0.06 milligrams of nicotine,” and that “[tjhere is currently no federal- or state-imposed cap on nicotine levels in cigarettes.” Haglund, 26 Mass. L. Rptr. 205 *1 (Superior Court 2009).

Exhibit 11 also reports that dipped tobacco was “tasteless” after this nicotine removal process. However, Dr. Farone’s testimony, which I credit, was that the defendant had the knowledge and the technology to add flavors back to the dipped tobacco to achieve a taste in keeping with the original product.